MATTHEW NOVIAN (SBN 324144)
matthew@novianlaw.com
LAUREN WOODLAND (SBN 283052)
Laurenw@novianlaw.com
CODY FISHER (SBN 342338)
fisher@novianlaw.com
NOVIAN & NOVIAN, LLP
1801 Century Park East, Suite 1201
Los Angeles, CA 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222
Attorneys for Plaintiffs Adam Risch and Yonatan Gliksman and the Proposed Class

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

ADAM RISCH and YONATAN GLIKSMAN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KALSHIEX LLC, a Delaware limited liability company; KALSHI INC., a Delaware corporation; KALSHI KLEAR LLC, a Delaware limited liability company; KALSHI KLEAR INC., a Delaware corporation; KALSHI TRADING LLC, a Delaware limited liability company; and DOES 1 through 50, inclusive,

Defendants.

CASE NO.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiffs Adam Risch ("Risch") and Yonatan Gliksman ("Gliksman") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action complaint against KalshiEX LLC ("KalshiEX" or the "Exchange"), Kalshi Inc. ("Kalshi"), Kalshi Klear LLC, Kalshi Klear Inc. (together, "Kalshi Klear"), Kalshi Trading LLC, and Does 1 through 50 (collectively, "Defendants"), and allege as follows:

2. This case exposes a predatory scheme to exploit retail consumers in the emerging prediction market industry. Defendants operate an online platform through which they invite consumers—including countless Californians—to purchase event contracts on real-world events, promising payouts if the consumer's prediction proves correct. But when those predictions come true and the payouts come due, Defendants unilaterally decide when, whether, and how much to pay—in direct contravention of the terms they presented to consumers at the time the trades were executed. This case represents the poster child of unfair competition, deceptive corporate behavior, and consumer fraud: a company that lures consumers in with clear promises, then pulls the rug out from under them when those promises become inconvenient.

3. This case arises from Defendants' operation of a prediction market contract titled "Ali Khamenei out as Supreme Leader?" (the "Khamenei Market" or the "Market"), which was opened on or about January 8, 2026, on the Kalshi exchange platform. The Market invited users to trade event contracts on whether Ayatollah Ali Khamenei would leave office as Supreme Leader of Iran before specified dates, including March 1, 2026 and April 1, 2026.

4. In the rules summary displayed to users at the time the Market was opened and during the period when most trades were placed, Defendants prominently represented that "if Ali Khamenei leaves office before March 1, 2026, then the market resolves to yes." This language was clear, unambiguous, and binary: if Khamenei left

office for any reason—including death—the Market would resolve to "yes" and holders of "yes" positions would receive the full contractual payout.

5. On February 28, 2026, the United States and Israel launched military strikes against Iran. News outlets began reporting that Khamenei had been killed. Khamenei's death was subsequently confirmed. By any reasonable interpretation of the Market's terms, Khamenei had "left office" before March 1, 2026, and the Market should have resolved to "yes."

6. Instead, after Khamenei's death became public, Defendants invoked a so-called "death carveout" provision—a fine-print mechanism designed to allow Defendants to avoid paying consumers what they were owed when the predicted event occurred through its most foreseeable scenario. Under this provision, Defendants asserted that if the leader "leaves solely because they have died," the Market would not resolve to "yes" but would instead settle based on an undefined "last traded price (prior to the death)."

7. As a result, Plaintiffs and the proposed class members—who correctly predicted the outcome—did not receive the amounts they were promised. Plaintiffs Risch and Gliksman, like thousands of other consumers who correctly predicted the outcome, received arbitrary amounts unilaterally determined by Defendants that were significantly lower than their respective contract values.

8. The "death carveout" upon which Defendants relied was not adequately disclosed to consumers. To the extent any version of the death carveout appeared in Defendants' formal contract terms or internal rules, it was not incorporated into the user-facing rules summary upon which consumers relied, and was not presented in a manner that would inform a reasonable consumer of its existence or effect. Defendants themselves later acknowledged that their prior disclosures were "grammatically ambiguous."

9. As news of the military strikes and Khamenei's death began circulating on February 28, 2026, Defendants continued to accept trades on the Market at increasingly favorable odds for consumers.

10. Rather than halt trading, Defendants promoted the Khamenei Market on social media during the very period when Khamenei's death was being reported, actively luring additional traders into the Market. Defendants accepted consumer after consumer's money, knowing that their internal settlement mechanism would deny those consumers the payouts they expected.

11. Indeed, retail consumers were drawn to the Khamenei Market precisely because of the extraordinary geopolitical circumstances unfolding in real time. With an American naval armada amassed on Iran's doorstep and military conflict not merely foreseeable but widely anticipated, consumers understood that the most likely—and in many cases the only realistic—mechanism by which an 85-year-old autocratic leader would "leave office" was through his death. Defendants understood this as well.

12. Defendants' conduct was deceptive, predatory, and exemplies unfair business practice. The "death carveout" was not disclosed to users at the time they placed their trades. The approximately $54 million in total trading volume on this Market reflects the massive scale of Defendants' deceptive conduct.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act), because this is a class action in which (a) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (b) at least one member of the proposed class is a citizen of a state different from Defendants; and (c) the proposed class consists of more than 100 members.

14. This Court has personal jurisdiction over Defendants because they operate a nationwide prediction market platform accessible to and used by California residents, they have solicited and transacted business with California residents, and a substantial portion of the acts giving rise to this action occurred in or were directed at this District.

Upon information and belief, Plaintiffs and numerous class members reside in the Central District of California.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, where Plaintiffs and numerous class members reside and accessed the Kalshi platform.

## PARTIES

16. Plaintiff Adam Risch is a natural person and citizen of the State of California who, at all relevant times, maintained an account on the Kalshi platform and traded on the Khamenei Market. On February 18, 2026 at approximately 8:57 a.m., Risch purchased 255 "yes" contracts on the "Before April 1, 2026" contract at a price of $0.28 per contract, with a fee of $3.60. On the same date at approximately 11:29 a.m., Risch purchased 329 "yes" contracts on the "Before March 1, 2026" contract at a price of $0.10 per contract, with a fee of $2.08. On February 28, 2026, at approximately 11:47 a.m., Risch purchased 781 "yes" contracts on the "Before March 1, 2026" contract at a price of $0.06 per contract, with a fee of $3.09. Risch's February 18 trades were placed ten days before any news of military strikes against Iran, at a time when no reasonable trader would have had any information asymmetry regarding the likelihood of Khamenei's death. Risch relied on the plain-language rules summary in making each of his trading decisions.

17. Plaintiff Yonatan Gliksman is a natural person and citizen of the State of California who, at all relevant times, maintained an account on the Kalshi platform and traded on the Khamenei Market. On February 28, 2026 at approximately 12:23 p.m. EST, Gliksman purchased 670 "yes" contracts on the "Before March 1, 2026" contract at an average price of $0.0746 per contract, with a fee of $3.06. On the same date at approximately 2:51 p.m. EST, Gliksman purchased 781 "yes" contracts on the "Before March 1, 2026" contract at an average price of $0.064 per contract, with a fee of $3.09. Gliksman's trades were executed on the day that news began circulating

regarding potential military strikes against Iran, at a time when the Kalshi platform was displaying a probability of approximately 6–7% for a "yes" outcome. Gliksman relied on the plain-language rules summary in making each of his trading decisions. .

18. Defendant KalshiEX LLC is a Delaware limited liability company with its principal place of business at 594 Broadway, Room 407, New York, New York 10012. KalshiEX is a Commodity Futures Trading Commission ("CFTC")-designated contract market ("DCM") that operates the Kalshi prediction market exchange.

19. Defendant Kalshi Inc. is a Delaware corporation with its principal place of business at 594 Broadway, Room 407, New York, New York 10012. Kalshi Inc. is the parent company of KalshiEX LLC, Kalshi Klear Inc., and Kalshi Trading LLC, and, upon information and belief, exercises control over the operations, policies, marketing, and contract terms of the Exchange.

20. Defendant Kalshi Klear Inc. is a Delaware corporation with its principal place of business at 594 Broadway, Room 407, New York, New York 10012. Kalshi Klear Inc. is a wholly owned subsidiary of Kalshi Inc. and the sole member of Kalshi Klear LLC.

21. Defendant Kalshi Klear LLC is a Delaware limited liability company with its principal place of business at 594 Broadway, Room 407, New York, New York 10012. Kalshi Klear LLC operates as a registered derivatives clearing organization and is responsible for determining outcomes, issuing payouts, and processing the movement of funds between traders on the Kalshi platform. Kalshi Klear LLC directly determined the settlement methodology applied to the Khamenei Market, including the decision to settle at the last traded price rather than resolving to "yes."

22. Defendant Kalshi Trading LLC is a Delaware limited liability company with its principal place of business at 594 Broadway, Room 407, New York, New York 10012. Kalshi Trading LLC is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker on the Kalshi platform..

23. Defendants Does 1 through 50 are individuals, corporations, partnerships, or other entities whose true names and capacities are presently unknown to Plaintiffs. Plaintiffs will seek leave to amend this Complaint to add their true names and capacities when ascertained.

## **FACTUAL ALLEGATIONS**

### ***A. Kalshi's Prediction Market Platform***

24. Kalshi operates one of the largest CFTC-regulated prediction market exchanges in the United States. The platform allows users to purchase binary "yes" or "no" contracts on specified future events. If the event resolves in favor of the user's prediction, the user receives a payment in the amount of their initial investment multiplied by the probability of the outcome. Users whose predictions prove incorrect lose their investment.

25. Kalshi has raised approximately $1.5 billion in venture capital funding from prominent investors including Sequoia Capital, Andreessen Horowitz, Y Combinator, and others. The platform has grown rapidly, processing tens of billions of dollars in annual trading volume across thousands of event contracts.

26. As a CFTC-designated contract market, Kalshi is required to comply with the Commodity Exchange Act ("CEA") and CFTC regulations, including requirements to maintain fair and transparent markets, prevent market manipulation, and ensure that contract terms are clear and not susceptible to manipulation.

27. Notwithstanding its regulatory obligations, Kalshi has been at the center of nationwide litigation and regulatory scrutiny concerning the legality of its operations. In 2024, the CFTC attempted to block Kalshi from offering political event contracts, and Kalshi sued the CFTC in the U.S. District Court for the District of Columbia. Beginning in early 2025, Kalshi expanded into sports event contracts, prompting cease-and-desist orders from gaming regulators in Nevada, New Jersey, Maryland, Connecticut, and Massachusetts, among other states. Kalshi has filed federal lawsuits against multiple state regulators, and courts have reached conflicting results on

whether Kalshi's operations constitute unlawful sports gambling. The U.S. District Court for the District of Maryland denied Kalshi's motion for a preliminary injunction, holding that the CEA does not clearly preempt state gambling laws. In January 2026, a Massachusetts state court issued a preliminary injunction barring Kalshi from allowing in-state users to execute sports-related trades without a license. In November 2025, a putative nationwide class of Kalshi users filed a class action alleging that Kalshi operates as an illegal, unlicensed sportsbook and unjustly profits from consumer losses.

28. This pattern of litigation reveals a company that has repeatedly pushed the boundaries of legality while demanding the protections of federal regulation. Notwithstanding the serious questions about the legality of its platform, Defendants continue to solicit trades from consumers across the country—and, as set forth below, continue to defraud those consumers by offering markets with terms that Defendants do not honor.

### *B. The Khamenei Market*

29. On or about January 8, 2026, Defendants opened the Khamenei Market on the Kalshi platform. The Market was titled "Ali Khamenei out as Supreme Leader?" and allowed users to trade binary contracts on whether Khamenei would cease to hold the position of Supreme Leader of Iran before specified dates, including March 1, 2026, April 1, 2026, and September 1, 2026.

30. The rules summary for the March 1, 2026 contract, as presented to users on the Market's webpage, stated: "if Ali Khamenei leaves office before March 1, 2026, then the market resolves to yes." This was the primary representation upon which Plaintiff and the proposed class members relied in making their trading decisions.

31. On February 18, 2026, Plaintiff Risch placed two trades on the Khamenei Market. At approximately 8:57 a.m., Risch purchased 255 "yes" contracts on the "Before April 1, 2026" contract at a price of $0.28 per contract, for an investment of approximately $75.00 including fees. At approximately 11:29 a.m., Risch purchased

329 “yes” contracts on the “Before March 1, 2026” contract at a price of $0.10 per contract, for an investment of approximately $34.98 including fees. On February 28, 2026 at approximately 11:47 a.m., Risch purchased 781 “yes” contracts on the “Before March 1, 2026” contract at a price of $0.06 per contract, for an investment of approximately $49.95 including fees.

32. On February 28, 2026, Plaintiff Gliksman executed two trades on the Khamenei Market. At approximately 12:23 p.m. EST, Gliksman purchased 670 “yes” contracts on the “Before March 1, 2026” contract at an average price of $0.0746 per contract, for an investment of approximately $49.96 including fees. At approximately 2:51 p.m. EST, Gliksman purchased 781 “yes” contracts on the “Before March 1, 2026” contract at an average price of $0.064 per contract, for an investment of approximately $49.95 including fees.

33. At the time Plaintiffs executed their trades, the rules summary for the Khamenei Market contracts stated simply that the market would resolve to “yes” if Khamenei left office before the specified date. Neither Risch nor Gliksman was aware of or adequately informed about any death carveout that would alter the settlement terms in the event of Khamenei’s death.

34. In total, the Khamenei Market attracted approximately $54 million in trading volume across all contract dates, with millions of dollars trading on the day of Khamenei’s death alone.

### *C. Khamenei’s Death and Defendants’ Retroactive Rule Invocation*

35. On February 28, 2026, the United States and Israel launched military strikes against Iran. News outlets began reporting that Khamenei had been killed in the strikes. His death was subsequently confirmed by both the U.S. government and Iranian authorities.

36. Upon confirmation of Khamenei’s death, traders who held “yes” contracts reasonably expected the Market to resolve to “yes” and to receive full payouts. Khamenei had indisputably “left office” before March 1, 2026.

37. Instead, Defendants paused trading on the Market at approximately 2:59 PM ET on February 28, 2026, citing their exchange rules, and conducted what they described as a "further review of the situation."

38. Thereafter, at approximately 10:06 PM ET, Defendants formally closed the Market and announced that the contracts would settle based on the "last traded price (prior to the death)" rather than resolving to "yes." Defendants invoked a "death carveout" provision, asserting that "[i]f <leader> leaves solely because they have died, the associated market will resolve and the Exchange will determine the payouts to the holders of long and short positions based upon the last traded price (prior to the death)."

39. The term "last traded price (prior to the death)" is undefined in any user-facing materials, and Defendants have never adequately explained how they arrived at the specific settlement price applied to the contracts. The methodology by which Defendants determined the so-called "last traded price"—including the precise timestamp used, the criteria for selecting that timestamp, and whether the same methodology was applied uniformly across all contract expiration dates—remains opaque and is a matter uniquely within Defendants' knowledge and control.

40. Critically, Defendants continued to accept trades on the Khamenei Market throughout the morning and early afternoon of February 28, 2026, even as reports of the strikes and Khamenei's death circulated widely on social media and news outlets. Defendants accepted trades from Plaintiff Risch at 11:47 a.m. and from Plaintiff Gliksman at approximately 12:23 p.m. and 2:51 p.m. EST—all while Defendants knew or should have known that, under their own death carveout, these contracts would not pay out in full even if Khamenei died. By continuing to accept trades at favorable odds without disclosing that the death carveout would deny consumers their expected payouts, Defendants accepted consideration for contracts they knew they would not honor.

41. As a direct result, Plaintiff Gliksman did not receive the amounts promised by the Market's terms and instead received a nominal payout—a fraction of what he was owed. Plaintiff Risch similarly did not receive the amounts promised and instead received significantly less than the contract value. Across the class, holders of "yes" positions either lost portions of their initial contract amounts or received significantly less than the contract value, despite correctly predicting the outcome.

### *D. The Death Carveout Was Not Adequately Disclosed*

42. The "death carveout" upon which Defendants relied was not adequately disclosed to Plaintiffs or the proposed class members at the time they entered into their trades. The primary rules summary displayed on the Market's webpage—the representation upon which reasonable users relied—stated simply that "if Ali Khamenei leaves office before March 1, 2026, then the market resolves to yes." This language contained no qualification, exception, or reference to any death-related carveout.

43. Upon information and belief, the death carveout may not have appeared in any user-accessible terms on the Market's trading page at the time Plaintiff Risch placed his earliest trades on February 18, 2026. The precise timeline of when Defendants first introduced, modified, or supplemented the death carveout language—in either the user-facing rules summary or the full contract terms—is a matter uniquely within Defendants' knowledge and control, and will be established through discovery.

44. Upon information and belief, the death carveout was buried in the fine print of the contract's formal terms, which were not disclosed in a manner that would inform a reasonable consumer of their existence or effect.

45. Defendants themselves acknowledged the inadequacy of their disclosures on multiple occasions. On February 28, 2026, at approximately 7:52 PM PST, Defendants sent an email to affected users titled "Kalshi - Khamenei Market Resolution," in which Defendants admitted: "we understand that many users did not have a full understanding of the rules for this market. It's a good reminder that we can

always do more to improve our UX and how we surface the rules." This constitutes a direct admission that Defendants' user interface and disclosure practices were deficient and that Defendants knew users had been misled about the operative terms of the Market.

46. In that same email, Defendants announced a purported remediation plan that fell far short of honoring the contracts: fees would be refunded; users who acquired positions before Khamenei's death would be "paid out based on the last-traded fair price before his death"; and users who acquired positions after his death at a cost exceeding the last-traded price would be reimbursed up to their cost of entry. Notably, Defendants characterized the last-traded-price settlement as having been "clear in our rules," while simultaneously acknowledging that users lacked a "full understanding" of those same rules—internally contradictory positions that further evidence Defendants' bad faith.

47. On information and belief, Defendants only added a prominent visual warning (the so-called "Green Box") about the death carveout to the Market's user interface after the military strikes on Iran had already begun. By that point, the overwhelming majority of trading activity had already occurred, and most class members had already entered their positions in reliance on the unqualified rules summary.

***E. Defendants' Aggressive Promotion of the Khamenei Market***

48. Defendants actively and aggressively promoted the Khamenei Market on social media, including on the platform X (formerly Twitter), during the very period when Khamenei's death was being reported. Among other promotional posts, Kalshi's official account posted: "BREAKING: The odds Ali Khamenei is out as Supreme Leader have surged to 68%." This post was reposted by Kalshi CEO Tarek Mansour.

49. These promotional efforts drew additional traders into the Market without adequate disclosure of the death carveout. Defendants promoted the Market as a straightforward binary event contract on whether Khamenei would leave office,

capitalizing on the heightened public interest in the Iranian military strikes to generate trading volume and fees, while knowing that their internal settlement mechanism would deny traders their expected payouts.

### *F. Defendants' Post-Hoc Admissions and Inadequate Remediation*

50. Following the widespread backlash from traders, Defendants engaged in a series of admissions that undercut their position. In the February 28, 2026 email to users, Defendants conceded that "many users did not have a full understanding of the rules for this market" and that Defendants needed to "improve our UX and how we surface the rules." Kalshi CEO Tarek Mansour separately published a series of statements on X in which he acknowledged user frustration, conceded that the platform would make changes to "more prominently highlight death carveouts in similar markets" going forward, and announced that Kalshi would reimburse all trading fees and cover certain net losses.

51. Mansour's promise to improve disclosure practices in the future constitutes an admission that Defendants' prior disclosures were inadequate.

52. However, Defendants' remediation efforts were insufficient. The reimbursement of fees and certain net losses did not compensate class members for the full value of their contracts. Defendants settled the Market at a fraction of the promised payout amounts, and the difference between the amounts consumers were promised and the amounts they received represents the minimum of damages suffered by the class.

53. Defendants' post-hoc conduct reveals the fundamental dishonesty of their position. Defendants now claim they "do not offer markets that settle on death" and that the death carveout was designed to prevent profiting from death. But this is precisely what Defendants did: they offered a market on whether an 85-year-old autocratic leader would be removed from power—where the single most foreseeable mechanism for his departure was his death—and then invoked a purported technicality to avoid honoring their promises when that foreseeable event occurred. Defendants

have unclean hands and should not be permitted to invoke policies designed to prevent profiting from death to shield themselves from liability for a market that was, in substance, a trade on that very outcome.

## CLASS ACTION ALLEGATIONS

54. Plaintiffs bring this action on behalf of themselves and all persons similarly situated, and seek certification of the following class and subclasses pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

**The "Class":** All persons in the United States who held "yes" positions on any contract within the Kalshi "Ali Khamenei out as Supreme Leader?" prediction market (ticker: KXKHAMENEIOUT), across any expiration date (including but not limited to the "Before March 1, 2026," "Before April 1, 2026," "Before June 1, 2026," and "Before September 1, 2026" contracts), at the time trading was halted on February 28, 2026

**Subclass A (the "Pre-Event Subclass"):** All Class members who acquired their "yes" positions on or before February 27, 2026—i.e., before any public reports of military strikes against Iran or the death of Ali Khamenei. Plaintiff Risch is designated as representative of Subclass A.

**Subclass B (the "Day-Of Subclass"):** All Class members who acquired their "yes" positions on February 28, 2026, whether before or after reports of military strikes began circulating but before Defendants halted trading on the Market. Plaintiff Gliksman is designated as representative of Subclass B.

55. Excluded from the Class are: (a) Defendants, their officers, directors, agents, and employees; (b) any entity in which Defendants have a controlling interest; (c) the judicial officers and court staff assigned to this matter; and (d) any person who timely and validly opts out of the Class.

56. **Numerosity.** Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The Khamenei Market attracted

approximately $54 million in total trading volume across thousands of individual traders. The proposed class consists of well more than 100 members.

57. **Commonality.** Common questions of law and fact predominate, including but not limited to: (a) when the death carveout was disclosed; (b) whether the death carveout was adequately disclosed; (c) whether Defendants' promotional activities were deceptive; (d) whether Defendants' conduct constituted fraud or an unfair business practice; (e) whether Defendants violated state consumer protection statutes; and (f) the proper measure of damages.

58. **Typicality.** Plaintiffs' claims are typical of the claims of the Class and their respective Subclasses. Plaintiff Risch, like all Pre-Event Subclass members, acquired "yes" positions well before the events of February 28, 2026, relied on the rules summary in making his trading decisions, was not adequately informed of the death carveout, and received a fractional payout after Defendants invoked the carveout. Plaintiff Gliksman, like all Day-Of Subclass members, acquired "yes" positions on February 28, 2026, when Defendants were actively accepting trades and promoting the Market despite knowing or having reason to know that their death carveout would prevent full payouts.

59. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class and their respective Subclasses. Plaintiffs have retained counsel experienced in complex litigation and class action proceedings, and have no interests antagonistic to the Class. Plaintiff Risch's pre-event trades, which span multiple contract expiration dates, make him an adequate representative of the Pre-Event Subclass and the broader Class. Plaintiff Gliksman's same-day trades make him an adequate representative of the Day-Of Subclass.

60. **Predominance and Superiority.** Questions of law and fact common to the Class predominate over any individual questions. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual

actions would be impractical given the relatively modest individual damages for many class members and the common course of conduct at issue.

## <u>CAUSES OF ACTION</u>

## FIRST CAUSE OF ACTION

### *Breach of Contract*

(On Behalf of Plaintiffs and the Class Against All Defendants)

61. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

62. At all relevant times, a valid and binding contractual relationship existed between Defendants and each Class member with respect to the Khamenei Market event contracts. By opening accounts on the Kalshi platform and purchasing "yes" contracts on the Khamenei Market, Plaintiffs and the Class members accepted Defendants' offer to pay the full contract value if the specified event occurred—*i.e.*, if Khamenei left office before the applicable deadline.

63. The operative contract terms, as presented to and understood by reasonable consumers, provided that "if Ali Khamenei leaves office before March 1, 2026, then the market resolves to yes." This language was clear, unambiguous, and unconditional. A reasonable consumer reading these terms would understand "leaves office" to encompass any cause of departure, including death.

64. Khamenei left office before March 1, 2026, by virtue of his death on February 28, 2026. The condition for a "yes" resolution was satisfied.

65. Defendants failed to pay Plaintiffs and the Class the full contract value. Instead, Defendants settled the contracts at a fraction of the amounts owed, based on a "death carveout" that was not disclosed to consumers in a manner sufficient to inform a reasonable consumer of its existence or effect.

66. As a direct and proximate result of Defendants' breach, Plaintiffs and the Class members have been damaged in an amount to be proven at trial, representing the

difference between the full promised contract payouts and the amounts actually received.

67. Defendants' conduct also constituted a breach of the implied covenant of good faith and fair dealing, which is implied in every contract under California law. Defendants acted in bad faith and frustrated Plaintiffs' and the Class members' right to receive the benefits of their contracts by invoking a concealed and deceptive settlement mechanism to avoid paying the full contract value, while simultaneously promoting the Market and accepting consumer trades with knowledge that those trades would not be honored in accordance with the terms as promoted.

## SECOND CAUSE OF ACTION

***Fraud and Intentional Misrepresentation***

(On Behalf of Plaintiffs and the Class Against All Defendants)

68. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. Beginning on or about January 8, 2026, when the Khamenei Market was opened, and continuing through February 28, 2026, when trading was halted, Defendants KalshiEX LLC and Kalshi Inc., through the Kalshi exchange platform located at kalshi.com, made the following material misrepresentations of fact to Plaintiffs and the Class:

70. First, Defendants displayed a rules summary on the Khamenei Market's trading page that stated: "if Ali Khamenei leaves office before March 1, 2026, then the market resolves to yes." This representation was the primary—and in many cases the only—description of the contract terms that users reviewed before executing their trades. The rules summary did not disclose any qualification, exception, or death-related carveout in a manner sufficient to inform a reasonable consumer that the settlement terms would be altered in the event of Khamenei's death. Defendants displayed this representation on the Market's webpage from on or about January 8,

2026 through February 28, 2026, and it was viewed by Plaintiffs Risch and Gliksman, among thousands of other users, prior to placing their trades.

71. Second, upon information and belief, Defendants failed to display any death-related carveout language on the Market's trading page until after reports of Khamenei's death began circulating on February 28, 2026—after the vast majority of trades had been placed. To the extent any carveout existed in Defendants' formal contract terms, it was buried in fine-print documentation that was not prominently displayed to consumers on the platform in a manner that would inform their trading decisions. Defendants knew or should have known that users were relying on the rules summary, not fine-print terms, in making their trading decisions.

72. Third, Defendants continued to accept trades on the Market throughout February 28, 2026, including trades from Plaintiff Risch at approximately 11:47 a.m. EST and from Plaintiff Gliksman at approximately 12:23 p.m. and 2:51 p.m. EST, at a time when Defendants knew or should have known that Khamenei had been killed and that, under their own death carveout, the contracts would not pay out in full. Defendants accepted these trades without disclosing the death carveout in a manner that would inform a reasonable consumer.

73. Defendants' misrepresentations were material. The omission of the death carveout from the rules summary fundamentally altered the nature of the contract being offered. Had Plaintiffs and the Class known that a death—the most foreseeable mechanism for Khamenei's departure from office—would not trigger a full payout, they would not have executed their trades or would have executed substantially different trades.

74. At all relevant times, Defendants knew that the user-facing portion of the rules summary omitted the death carveout, and that users were relying on the rules summary in making their trading decisions. Defendants intentionally failed to disclose the death carveout in a manner that would inform a reasonable consumer, for the

purpose of inducing consumers to execute trades that Defendants knew would not be honored in accordance with the terms as presented.

75. Plaintiffs and the Class reasonably relied on Defendants' representations as displayed on the Market's trading page and, in reliance thereon, purchased "yes" contracts on the Khamenei Market. Specifically, Plaintiff Risch visited the Khamenei Market trading page on February 18 and February 28, 2026, viewed the rules summary stating that the market would resolve to "yes" if Khamenei left office before the applicable deadline, was not made aware of any death carveout or exception through the trading page, and executed his trades in reliance on those terms. Plaintiff Gliksman visited the same trading page on February 28, 2026, viewed the same deceptive interface, and executed his trades in reliance thereon. A reasonable consumer reading the rules summary would understand "leaves office" to encompass any cause of departure from office, including death. To the extent that additional details regarding the precise timing and manner in which Defendants implemented, modified, or concealed the death carveout are not alleged with specificity herein, such details are peculiarly within the knowledge and control of Defendants and cannot be alleged without access to discovery.

76. As a direct and proximate result of Defendants' fraud, Plaintiffs and the Class members have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### *Negligent Misrepresentation*

(On Behalf of Plaintiffs and the Class Against All Defendants)

77. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

78. In the course of operating a consumer-facing trading platform and supplying information regarding the terms and conditions of event contracts for the guidance of users in making their trading decisions, Defendants owed a duty to exercise reasonable care in ensuring that such information was accurate and not misleading.

79. Defendants negligently and carelessly misrepresented the terms of the Khamenei Market contracts by presenting a market interface including a rules summary that concealed material information regarding the death carveout and by failing to adequately disclose the conditions under which full payouts would be denied.

80. Plaintiffs and the Class justifiably relied on Defendants' representations. As a direct and proximate result of Defendants' negligent misrepresentation, Plaintiffs and the Class members have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### ***Violation of California's Unfair Competition Law***

Cal. Bus. & Prof. Code §§ 17200, et seq.

(On Behalf of Plaintiffs and the Class Against All Defendants)

81. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

82. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

83. Defendants' conduct, as described herein, constitutes unlawful, unfair, and/or fraudulent business practices within the meaning of the UCL, including but not limited to: (a) presenting contract terms to users that concealed material settlement conditions; (b) aggressively and predatorily promoting the Market to capitalize on heightened public interest in the United States' military engagement with Iran, driving trading volume and fees while knowing that consumers were not adequately informed of its material settlement terms; (c) invoking undisclosed or inadequately disclosed terms to avoid contractual obligations; and (d) settling the Market in a manner that deprived users of their legitimate earnings.

84. Defendants' unfair and deceptive practices caused Plaintiffs and the Class to suffer injury in fact and to lose money as a direct result. Plaintiffs and the Class surrendered money in transactions they would not have entered into absent

Defendants' deceptive practices, and were deprived of the contract payouts to which they had a cognizable claim.

85. Plaintiffs seek restitution of all amounts wrongfully retained by Defendants, disgorgement of ill-gotten gains, and injunctive relief barring Defendants from offering, promoting, or accepting trades on event contracts without prominently and conspicuously disclosing all material settlement terms, conditions, exceptions, and carveouts, prior to the execution of any trade.

## FIFTH CAUSE OF ACTION

### *Violation of California's Consumers Legal Remedies Act*

Cal. Civ. Code §§ 1750, et seq.

(On Behalf of Plaintiffs and the Class Against All Defendants)

86. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

87. California's Consumers Legal Remedies Act ("CLRA") prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result in the sale of goods or services to consumers. Cal. Civ. Code § 1770. Defendants operate a consumer-facing online trading platform that is marketed to and used by ordinary retail consumers, not solely by institutional or sophisticated investors. Defendants provide consumers with a service—namely, access to the Kalshi exchange platform and the execution, clearing, and settlement of event contracts—in exchange for fees and trading consideration. The transactions at issue constitute consumer service transactions within the meaning of the CLRA.

88. Defendants' conduct, as described herein, violated the CLRA by, among other things: (a) representing that the Khamenei Market contracts had characteristics, uses, or benefits that they did not have; (b) advertising goods or services with intent not to sell them as advertised; and (c) engaging in deceptive representations in connection with the sale of services.

89. As a result of Defendants' violations of the CLRA, Plaintiffs and the Class have suffered actual damages. Pursuant to California Civil Code section 1782(d), Plaintiffs bring this cause of action for injunctive relief without prior notice to Defendants. Plaintiffs seek injunctive relief barring Defendants from engaging in the unlawful practices described herein, including injunctive relief requiring Defendants to prominently and conspicuously disclose all material settlement terms, conditions, exceptions, and carveouts prior to the execution of any trade. Concurrently with the filing of this Complaint, Plaintiffs are serving written notice on Defendants pursuant to California Civil Code section 1782(a), demanding that Defendants correct, repair, replace, or otherwise rectify the practices alleged herein to violate the CLRA. Not less than thirty (30) days after service of such notice, Plaintiffs intend to amend this Complaint, without leave of court pursuant to section 1782(d), to include a request for actual damages, attorneys' fees, and all other relief available under the CLRA.

**SIXTH CAUSE OF ACTION**

***Unjust Enrichment***

(On Behalf of Plaintiffs and the Class Against All Defendants)

90. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

91. Plaintiffs and the Class conferred a benefit on Defendants by paying consideration for "yes" contracts on the Khamenei Market and by paying trading fees associated with those contracts.

92. Defendants have been unjustly enriched in retaining the benefit of the amounts paid by Plaintiffs and the Class without providing the contractually promised payouts. It would be unjust and inequitable for Defendants to retain these benefits.

93. Plaintiffs and the Class are entitled to restitution of the amounts by which Defendants have been unjustly enriched.

## SEVENTH CAUSE OF ACTION

***Violation of California Penal Code Section 496(c)***

(On Behalf of Plaintiffs and the Class Against All Defendants)

94. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

95. Pursuant to California Penal Code section 496(a), receiving property "that has been obtained in any manner constituting theft" is a criminal offense. Pursuant to California law, procuring funds by false pretenses constitutes a violation of Section 496(a). Pursuant to Section 496(c), any person that violates Section 496(a) is liable to the victim for treble the amount of actual damages sustained, plus reasonable attorney's fees.

96. Defendants obtained money from Plaintiffs and the Class through false pretenses by: (a) representing that the Khamenei Market would resolve to "yes" if Khamenei "leaves office" before the specified date, without adequately or conspicuously disclosing the material death carveout exception; (b) inducing Plaintiffs and the Class to pay consideration—real dollars from their personal funds—to purchase "yes" contracts based on those representations; and (c) thereafter invoking undisclosed or inadequately disclosed terms to retain the consideration paid by consumers while refusing to honor the contracts as presented. But for Defendants' misrepresentations, Plaintiffs and the Class would not have paid the consideration they paid. Defendants' purpose in making these false pretenses was to induce consumers to transfer money to Defendants that Defendants knew they would not return in accordance with the terms presented to those consumers.

97. Defendants received and retained property—namely, the consideration paid by Plaintiffs and the Class to purchase option contracts on the Khamenei Market—that was obtained through the false pretenses described herein, in violation of Penal Code section 496(a). The property at issue is the actual money consumers paid to

Defendants in reliance on Defendants' misrepresentations, which Defendants have retained without honoring the contracts as presented.

98. Pursuant to Penal Code section 496(c), Plaintiffs and the Class are entitled to recover treble actual damages, plus reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class and Subclasses, respectfully request that this Court enter judgment against Defendants and grant the following relief:

A. An order certifying the proposed Class and Subclasses, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Compensatory damages in an amount to be determined at trial, representing the full value of the "yes" contract payouts owed to Plaintiffs and the Class, absent application of the "death carveout," less any amounts already paid;

C. Restitution of all funds wrongfully retained by Defendants;

D. Disgorgement of all profits, benefits, and other compensation obtained by Defendants as a result of their wrongful conduct;

E. Punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future;

F. Pre-judgment and post-judgment interest as permitted by law;

G. Attorneys' fees and costs of suit as permitted by law;

H. Injunctive relief requiring Defendants to reform their disclosure practices to ensure that material contract terms, including any settlement exceptions or carveouts, are prominently and clearly disclosed to users before trades are executed; and

I. Such other and further relief as this Court deems just and equitable.

///

///

///

DATED: March 5, 2026

Respectfully submitted,
NOVIAN & NOVIAN, LLP

By: /s/ Matthew Novian
MATTHEW NOVIAN
Attorneys for Plaintiffs Adam Risch and Yonatan Gliksman and the Proposed Class

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of the Class and Subclasses, hereby demand a trial by jury on all claims and issues so triable.

DATED: March 5, 2026

NOVIAN & NOVIAN, LLP

By: /s/ Matthew Novian
MATTHEW NOVIAN
Attorneys for Plaintiffs Adam Risch and Yonatan Gliksman and the Proposed Class