**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ITAY GOLAN, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>KALSHIEX LLC, KALSHI INC., KALSHI KLEAR LLC, KALSHI KLEAR INC., and KALSHI TRADING LLC,<br><br>Defendants. | Case No. 1:26-cv-02394-ER |
| ADAM RISCH and YONATAN GLIKSMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>KALSHIEX LLC, KALSHI INC., KALSHI KLEAR LLC, KALSHI KLEAR INC., KALSHI TRADING LLC, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 1:26-cv-04734-ER |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 4

I. The Sign-Up Screen Plaintiffs Actually Encountered ........ 4

II. Kalshi's Motion Does Not Proffer Any Evidence of the Mobile Phone Interfaces Plaintiffs Actually Used ........ 7

ARGUMENT ........ 8

I. Legal Standard ........ 8

II. State Law Determines Whether an Arbitration Agreement Was Formed ........ 9

A. The Motion Fails Under Either California's or New York's Formation Rules ........ 9

B. This Court's Decisions in Presson and Segui Confirm That No Agreement Was Formed ........ 10

III. Kalshi Fails to Meet Its Burden of Establishing That a Valid Arbitration Agreement Existed ........ 11

A. Kalshi Cannot Show That the Arrow Connected Consumers to Any Operative "Terms," Much Less Terms Containing an Arbitration Clause 12

B. Kalshi's Notice Sentence Was Not Reasonably Conspicuous ........ 14

C. Plaintiffs Never Assented to the Arbitration Clause ........ 19

D. The Cases on Which Kalshi Relies Are Inapposite Because They Concern Materially Different Interfaces Than the Mobile Phone Application Interface at Issue Here ........ 21

E. The Number of Times Plaintiffs Logged In to the Kalshi Platform Is Irrelevant to Whether Kalshi's Platform Gave Conspicuous Notice of the Arbitration Clause ........ 23

F. Kalshi's Evidence Is Inadmissible and Insufficient ........ 24

IV. Even If Kalshi Could Establish That Plaintiffs Assented to the Platform's "Terms" (Plaintiffs Did Not), Those Terms Do Not Compel Arbitration of Plaintiffs' Claims ........ 27

A. The Rulebook's Only Arbitration Chapter Makes Arbitration Elective, and Kalshi Cannot Invoke It ........ 28

B. Federal Law Requires That Exchange Arbitration Be Voluntary for the Customer ........ 29
C. Rule 11.3(d) Purports to Compel Arbitration Under Chapter Rules That Do Not Exist ........ 30
D. Plaintiffs' Claims Do Not Arise Out of Kalshi's "Terms" and Therefore Cannot Be Compelled to Arbitration ........ 32
V. The Issue of Arbitrability Is for the Court, Not an Arbitrator, to Decide ........ 33
VI. Kalshi's Arbitration Scheme Is Arbitration in Name Only, Unconscionable, and Illusory ........ 34
A. A Kalshi-Judged, Kalshi-Funded Forum Is Not Arbitration Under the FAA ........ 34
B. Kalshi's Dispute Resolution Scheme Is Unconscionable Under New York and California Law ........ 35
C. Kalshi's Purported Arbitration Agreement Is Illusory ........ 37
VII. The Non-Signatory Defendants Cannot Compel Arbitration ........ 38
A. Kalshi's Own Definition of "Kalshi Parties" Excludes the Non-Signatory Defendants ........ 38
B. The Non-Signatory Defendants Cannot Invoke Equitable Estoppel to Compel Arbitration of Plaintiffs' Claims Against Them ........ 38
C. The Clearinghouse Defendants' Own Rulebook Chooses This Court ........ 40
CONCLUSION ........ 40

# TABLE OF AUTHORITIES

## Cases

*Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
567 F.2d 1174 (2d Cir. 1977) ........ 29

*Applebaum v. Lyft, Inc.*
263 F. Supp. 3d 454 (S.D.N.Y. 2017) ........ 15, 16, 31

*Armendariz v. Found. Health Psychcare Servs., Inc.*
24 Cal. 4th 83 (2000) ........ 36, 37

*Barrows v. Brinker Rest. Corp.*
36 F.4th 45 (2d Cir. 2022) ........ 8

*Bassett v. Elec. Arts, Inc.*
93 F. Supp. 3d 95 (E.D.N.Y. 2015) ........ 37

*Bensadoun v. Jobe-Riat*
316 F.3d 171 (2d Cir. 2003) ........ 9, 40

*Berger v. JetBlue Airways Corp.*
2024 WL 4107243 (E.D.N.Y. Sept. 6, 2024) ........ 24

*Berkson v. Gogo LLC*
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ........ 13

*Berman v. Freedom Fin. Network, LLC*
30 F.4th 849 (9th Cir. 2022) ........ 12, 13, 16

*Brower v. Gateway 2000, Inc.*
246 A.D.2d 246 (1st Dep't 1998) ........ 36

*Calderon v. Sixt Rent a Car, LLC*
5 F.4th 1204 (11th Cir. 2021) ........ 32

*Chabolla v. ClassPass Inc.*
129 F.4th 1147 (9th Cir. 2025) ........ 10, 20

*Colgate v. JUUL Labs, Inc.*
402 F. Supp. 3d 728 (N.D. Cal. 2019) ........ 16, 17, 21, 22, 24

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*
58 F.3d 16 (2d Cir. 1995) ........ 9, 33

*Contec Corp. v. Remote Solution Co.*
398 F.3d 205 (2d Cir. 2005) ........................................ 34

*Cullinane v. Uber Techs., Inc.*
893 F.3d 53 (1st Cir. 2018) ........................................ 16, 17, 21, 22

*Davitashvili v. Grubhub Inc.*
131 F.4th 109 (2d Cir. 2025) ........................................ 16, 32

*Dawson v. Target Corp.*
2025 WL 1651940 (N.D. Cal. June 11, 2025) ........................................ 27

*DeSimone v. Select Portfolio Servicing, Inc.*
748 F. Supp. 3d 136 (E.D.N.Y. 2024) ........................................ 32

*Dillon v. BMO Harris Bank, N.A.*
173 F. Supp. 3d 258 (M.D.N.C. 2016) ........................................ 26

*Doctor's Assocs., Inc. v. Alemayehu*
934 F.3d 245 (2d Cir. 2019) ........................................ 33

*Doe v. Trump Corp.*
453 F. Supp. 3d 634 (S.D.N.Y. 2020) ........................................ 39

*Dreyfuss v. eTelecare Glob. Sols.–US, Inc.*
349 F. App'x 551 (2d Cir. 2009) ........................................ 8

*Eakins v. Whaleco, Inc.*
721 F. Supp. 3d 1252 (W.D. Okla. 2024) ........................................ 22

*Edmundson v. Klarna, Inc.*
85 F.4th 695 (2d Cir. 2023) ........................................ 2, 11, 12, 16, 21, 22, 23

*Eisen v. Venulum Ltd.*
244 F. Supp. 3d 324 (W.D.N.Y. 2017) ........................................ 35

*Feld v. Postmates, Inc.*
442 F. Supp. 3d 825 (S.D.N.Y. 2020) ........................................ 12, 21, 22, 23

*First Options of Chicago, Inc. v. Kaplan*
514 U.S. 938 (1995) ........................................ 9, 34

*Flores v. New York Football Giants, Inc.*
150 F.4th 172 (2d Cir. 2025) ........................................ 3, 35, 36

*Flores v. NFL*
2026 WL 407884 (S.D.N.Y. Feb. 13, 2026) .......... 35
*Flores v. NFL*
658 F. Supp. 3d 198 (S.D.N.Y. 2023) .......... 37
*Fteja v. Facebook, Inc.*
841 F. Supp. 2d 829 (S.D.N.Y. 2012) .......... 19, 22
*Geldermann, Inc. v. CFTC*
836 F.2d 310 (7th Cir. 1987) .......... 29
*Ghazizadeh v. Coursera, Inc.*
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 25
*Gillman v. Chase Manhattan Bank, N.A.*
73 N.Y.2d 1 (1988) .......... 35
*Gingras v. Think Fin., Inc.*
922 F.3d 112 (2d Cir. 2019) .......... 34
*Godun v. JustAnswer LLC*
135 F.4th 699 (9th Cir. 2025) .......... 10
*Goldman v. KPMG LLP*
173 Cal. App. 4th 209 (2009) .......... 39
*Granite Rock Co. v. Int'l Bhd. of Teamsters*
561 U.S. 287 (2010) .......... 8, 33
*Hastings v. Nifty Gateway, LLC*
724 F. Supp. 3d 241 (S.D.N.Y. 2024) .......... 21, 22
*Heckman v. Live Nation Entertainment, Inc.*
120 F.4th 670 (9th Cir. 2024) .......... 36
*Hooters of Am., Inc. v. Phillips*
173 F.3d 933 (4th Cir. 1999) .......... 36
*Hu v. Whaleco Inc.*
779 F. Supp. 3d 265 (E.D.N.Y. 2024) .......... 12, 16, 21, 22, 23
*In re Currency Conversion Fee Antitrust Litig.*
361 F. Supp. 2d 237 (S.D.N.Y. 2005) .......... 36

*In re Salomon Inc. S'holders' Derivative Litig.*
68 F.3d 554 (2d Cir. 1995) ........................................ 31
*Kelly Toys Holdings, LLC v. Top Dep't Store*
2022 WL 3701216 (S.D.N.Y. Aug. 26, 2022) ........................................ 24
*Kern v. StubHub, Inc.*
2024 WL 5283923 (S.D.N.Y. Dec. 17, 2024) ........................................ 12, 21, 22, 23
*Knipe v. Skinner*
999 F.2d 708 (2d Cir. 1993) ........................................ 27
*L&R Farm P'ship v. Cargill Inc.*
963 F. Supp. 2d 798 (W.D. Tenn. 2013) ........................................ 30
*Leist v. Simplot*
638 F.2d 283 (2d Cir. 1980) ........................................ 29
*Linders v. Festival Fun Parks, LLC*
830 F. Supp. 3d 277 (D. Conn. 2026) ........................................ 24
*Marciano v. DCH Auto Grp.*
14 F. Supp. 3d 322 (S.D.N.Y. 2014) ........................................ 37
*Marcus v. Collins*
2016 WL 8201629 (S.D.N.Y. Dec. 30, 2016) ........................................ 9
*Mayfield v. Asta Funding, Inc.*
95 F. Supp. 3d 685 (S.D.N.Y. 2015) ........................................ 8
*Menowitz v. Brown*
991 F.2d 36 (2d Cir. 1993) ........................................ 9
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*
456 U.S. 353 (1982) ........................................ 29
*Meyer v. Uber Techs., Inc.*
868 F.3d 66 (2d Cir. 2017) ........................................ 11, 14, 16, 21, 22
*Moss v. First Premier Bank*
835 F.3d 260 (2d Cir. 2016) ........................................ 31
*Ngo v. BMW of N. Am., LLC*
23 F.4th 942 (9th Cir. 2022) ........................................ 39

*Nicosia v. Amazon.com, Inc.*
834 F.3d 220 (2d Cir. 2016) .................................................................... 3, 11, 14, 19, 22

*O'Callaghan v. Uber Corp.*
2018 WL 3302179 (S.D.N.Y. July 5, 2018)........................................................... 9, 15, 20, 22

*Oberstein v. Live Nation Entertainment, Inc.*
60 F.4th 505 (9th Cir. 2023) ........................................................................................ 16, 22

*Peleg v. Neiman Marcus Grp., Inc.*
204 Cal. App. 4th 1425 (2012) .......................................................................................... 37

*Phillips v. Audio Active Ltd.*
494 F.3d 378 (2d Cir. 2007) .............................................................................................. 32

*Picha v. Gemini Trust Co.*
2024 WL 967182 (S.D.N.Y. Mar. 5, 2024) ........................................................................ 23

*Pilon v. Discovery Commc'ns, LLC*
769 F. Supp. 3d 273 (S.D.N.Y. 2025) ................................................................................. 9

*Plata v. Lands' End, Inc.*
2024 WL 5339858 (C.D. Cal. Dec. 19, 2024) .................................................................... 12

*Presson v. Alamo Intermediate II Holdings, LLC*
No. 24-cv-170 (ER), 2025 WL 692123 (S.D.N.Y. Mar. 4, 2025)............................. 2, 9, 10, 19

*Preston v. Ferrer*
552 U.S. 346 (2008)............................................................................................................ 33

*Quadrant Structured Prods. Co. v. Vertin*
23 N.Y.3d 549 (2014) ......................................................................................................... 38

*Quamina v. JustAnswer LLC*
721 F. Supp. 3d 1026 (N.D. Cal. 2024) ....................................................................... 17, 21

*Register.com, Inc. v. Verio, Inc.*
356 F.3d 393 (2d Cir. 2004) .............................................................................................. 23

*Resorb Networks, Inc. v. YouNow.com*
51 Misc. 3d 975, 30 N.Y.S.3d 506 (Sup. Ct. N.Y. Cnty. 2016) ........................................ 12

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*
687 F. Supp. 2d 381 (S.D.N.Y. 2010) ................................................................................ 27

*Revitch v. DIRECTV, LLC*
977 F.3d 713 (9th Cir. 2020) ..................................................................................... 32

*Sanchez v. Clipper Realty, Inc.*
638 F. Supp. 3d 357 (S.D.N.Y. 2022) ........................................................................ 32

*Schnabel v. Trilegiant Corp.*
697 F.3d 110 (2d Cir. 2012) ........................................................................... 9, 19, 23

*Segui v. Mosaic*
--- F. Supp. 3d ----, 2026 WL 1724022 (S.D.N.Y. June 15, 2026)..................................... 2, 40

*Segui v. Solar Mosaic LLC*
802 F. Supp. 3d 545 (S.D.N.Y. 2025) ................................................ 2, 9, 10, 14, 20

*Sellers v. JustAnswer LLC*
73 Cal. App. 5th 444 (2021) ......................................................................... 14, 17, 22

*Skillern v. Peloton Interactive, Inc.*
2022 WL 3718279 (S.D.N.Y. Aug. 29, 2022)................................................................ 20, 24

*SlackPass, Inc. v. Frosted, Inc.*
2026 WL 878691 (S.D.N.Y. Mar. 31, 2026) ....................................................................... 30

*Snow v. Eventbrite, Inc.*
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ............................................................. 2, 25, 26

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*
999 F.3d 828 (2d Cir. 2021) ......................................................................... 13, 17, 19

*Specht v. Netscape Commc'ns Corp.*
306 F.3d 17 (2d Cir. 2002) ........................................................................... 11, 17, 18

*Starke v. SquareTrade, Inc.*
913 F.3d 279 (2d Cir. 2019) ................................................................... 13, 15, 17, 23

*Teta v. Go New York Tours Inc.*
738 F. Supp. 3d 502 (S.D.N.Y. 2024) ................................................................ 20, 22

*Thorne v. Square, Inc.*
2022 WL 542383 (E.D.N.Y. Feb. 23, 2022). ..................................................... 12, 18, 19

*Toth v. Everly Well, Inc.*
118 F.4th 403 (1st Cir. 2024)......................................................................................... 38

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*
63 N.Y.2d 396 (1984) .......... 38

*Van Dusen v. Barrack*
376 U.S. 612 (1964) .......... 9

*Viking River Cruises, Inc. v. Moriana*
596 U.S. 639 (2022) .......... 32

*Wright v. Universal Mar. Serv. Corp.*
525 U.S. 70 (1998) .......... 33

*Wu v. Uber Techs., Inc.*
43 N.Y.3d 288 (2024) .......... 2, 11, 16, 22

*Zachman v. Hudson Valley Fed. Credit Union*
49 F.4th 95 (2d Cir. 2022) .......... 3, 25

**Statutes**

7 U.S.C. § 7(d)(14) .......... 29

9 U.S.C. § 2 .......... 32

9 U.S.C. § 4 .......... 9

**Federal Rules**

Fed. R. Civ. P. 56(c)(2) .......... 24

Fed. R. Civ. P. 56(c)(4) .......... 24

**Regulations**

17 C.F.R. § 166.5 .......... 30

17 C.F.R. § 38.750 .......... 29

7 C.F.R. pt. 38, app. B, Core Principle 14(b)(2) .......... 29

## PRELIMINARY STATEMENT

Kalshi asks this Court to order its customers into an arbitration that Kalshi itself would administer, under an agreement those customers never saw and never accepted. Its theory of contract formation is a scavenger hunt. Start with an animated sign-up screen whose full-width graphic rewrites itself every few seconds ("Trade on sports," "Trade on crypto," "Trade on anything"). Go to the very bottom, beneath three buttons that say nothing about agreeing to anything, and find the smallest, faintest sentence on the screen, which ties agreement to no named action and merely "recommend[s] reviewing" unnamed "legal terms." Somehow recognize that the small, bare arrow at the end of that sentence can be tapped at all, though it is not underlined, not colored, and not labeled. Tap it. Scroll through a menu titled "Legal stuff" containing seven documents, none of them called "Terms." Guess correctly that the one that matters is the "Member Agreement." Open it, and locate the sentence incorporating "the Kalshi Rulebook," a separate document of roughly 84 pages. (ECF No. 64-2 § VII.A.) Obtain that rulebook by returning to the menu, which lists two candidates, "Rulebook" and "Kalshi Klear Rulebook," without saying which one is the rulebook the Member Agreement means. Guess correctly a second time. Pass over the chapter actually titled "Arbitration," because that chapter, it turns out, is not the one Kalshi means (that chapter makes arbitration optional and governs only disputes between traders). Turn instead to the chapter captioned "Limitation of Liability" and read to subsection 11.3(d). That subsection of the Rulebook, buried in a chapter whose title says nothing about arbitration, is the entire foundation of Kalshi's motion.

No plaintiff took that journey, and the law did not require them to do so. A consumer is bound only by terms presented in a reasonably conspicuous way and accepted through conduct the interface clearly warned would constitute assent. *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703–

05 (2d Cir. 2023) (setting out the two-part inquiry); *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 302–04 (2024) (adopting *Edmundson* as New York law). Kalshi's interface flunks both requirements.

This Court has already drawn the lines that decide this motion. In *Presson v. Alamo Intermediate II Holdings, LLC*, No. 24-cv-170 (ER), 2025 WL 692123, at *5 (S.D.N.Y. Mar. 4, 2025) (Ramos, J.), the Court held that pressing a button "in no way connected to the linked Terms" binds no one. In *Segui v. Solar Mosaic LLC*, 802 F. Supp. 3d 545, 563–65 (S.D.N.Y. 2025) (Ramos, J.), the Court refused to enforce terms that never became "obvious" or were never "called to the offeree's attention" during enrollment, and it reaffirmed that holding just thirty days before Kalshi filed this motion. *Segui v. Mosaic*, --- F. Supp. 3d ----, 2026 WL 1724022 (S.D.N.Y. June 15, 2026). Kalshi's notice and terms are less conspicuous than the ones this Court has already declined to enforce. Its buttons promise only to "Continue" or "Signup." Its notice hides in the smallest text on a text-filled animated page. Its lone gateway to any legal document is a tiny arrow that no reasonable user would recognize as a link, which opens a menu that never identifies what, if anything, the user is agreeing to.

The motion fails for a second, independent reason: Kalshi has not proven the interface Plaintiffs actually encountered. Every plaintiff enrolled on a mobile phone. (Risch Decl. ¶ 4; Gliksman Decl. ¶ 4; Golan Decl. ¶ 4.) Every screenshot in Kalshi's declaration depicts its desktop website, a different interface on a different device, with its own layout that bears no resemblance to the mobile application Plaintiffs actually used. The declaration glosses over the mismatch with one conclusory sentence, asserting the app is "the same in all relevant parts." (Sottile Decl. ¶ 14.) Courts reject exactly that maneuver, because conspicuousness turns on design, not text. *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *4–6 (N.D. Cal. Oct. 19, 2020) (denying enforcement where the movant never showed what the interface looked like when the plaintiff used it); *Zachman*

*v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022) ("When it comes to digital contract formation, courts also evaluate visual evidence that demonstrates 'whether a website user has actual or constructive notice of the conditions.'" (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016))). Kalshi's exhibits are undated, unsourced, and tied to no plaintiff, and its screens demonstrably change over time. Its screens have changed twice since December 2024. (Sottile Decl. ¶ 33; Carmona Decl. ¶¶ 5, 8.) A movant in exclusive control of the evidence, who cannot or will not show what the consumer actually saw, has not carried its burden.

Finally, even a formed agreement would not move these claims out of this Court. The Rulebook's only arbitration chapter makes arbitration elective, at the customer's option, exactly as federal commodities regulation requires. Federal law has made exchange arbitration voluntary for the customer for fifty years; Kalshi's Rulebook obeys that command, and its motion defies it. The provision Kalshi invokes commands arbitration under the rules of a chapter that contains none. The claims themselves are statutory consumer claims that do not arise out of any Kalshi contract within the meaning of the Federal Arbitration Act. No delegation clause exists, so every one of these questions belongs to this Court. And the forum Kalshi designed, which Kalshi convenes, which Kalshi's own oversight committee may staff, and whose fees are payable to Kalshi, is arbitration in name only under *Flores v. New York Football Giants, Inc.*, 150 F.4th 172 (2d Cir. 2025), while the affiliate defendants, whom the Rulebook's own definitions exclude, cannot enforce it regardless. At a minimum, Kalshi's submission generates factual disputes that require denial or a trial under 9 U.S.C. § 4. *Nicosia*, 834 F.3d at 229–30 (summary-judgment standard governs, with all reasonable inferences drawn against the movant).

/ / /

/ / /

## STATEMENT OF FACTS

### I. The Sign-Up Screen Plaintiffs Actually Encountered

Plaintiffs Adam Risch, Yonatan Gliksman, and Itay Golan each opened Kalshi accounts on their mobile phones in January 2026. (Risch Decl. ¶¶ 3–4; Gliksman Decl. ¶¶ 3–4; Golan Decl. ¶¶ 3–4.) The app's sign-up screen is dominated by an animated graphic that cycles through trading pitches ("Trade on" sports, crypto, and other topics) above three white "pill" buttons labeled "Continue with Google," "Continue with Apple," and "Signup with Email," and a login prompt. (*Id.* ¶¶ 5–6; Carmona Decl. ¶ 6 & Ex. F (screen recording); Novian Decl. ¶ 7 & Ex. B.) None of those buttons says anything about terms, agreements, or conditions:




*Figure 1 (above): The Kalshi iOS app sign-up screen. The graphic animates, cycling through trading pitches (as depicted in Figure 2); a screen recording of the current version of the screen (as of August 11,*

*2026) is lodged with the Court because a still image cannot capture the motion.* (Carmona Decl. ¶¶ 5–6 & Ex. F (August 11, 2026).) (Novian Decl. ¶ 7 & Ex. B (March 24, 2026, iPhone 16 Pro Max).) *The login interface reflected in Figure 1, is, on information and belief, the interface in effect in early 2026.*




*Figure 2: Three frames from March 24, 2026 of the animated graphic on the same sign-up screen, captured milliseconds apart as it cycles through trading pitches.* (Fisher Decl. ¶ 4 & Ex. E (captured March 24, 2026, iPhone 16 Pro); Novian Decl. ¶ 8.) *For the animation in motion, see the screen recording lodged with the Court.* (Carmona Decl. ¶¶ 5–6 & Ex. F.)

At the very bottom of the screen (*see Figure 1*), in the smallest and lowest-contrast text displayed, appears a single sentence: "By continuing, you acknowledge and agree to Kalshi's legal terms, which we recommend reviewing →" (the "Notice Sentence"). The minuscule trailing arrow (the "Arrow") is the only path to any legal document. It is not underlined, not colored, and not styled in any way. Nothing about it even discloses that it is a link at all, rather than a decorative flourish. (Carmona Decl. ¶ 6 & Ex. F; Risch Decl. ¶ 8; Gliksman Decl. ¶ 8.) Tapping it opens a menu titled "Legal stuff" containing seven listed documents. None is titled "Terms," "Terms of Use," or "Terms of Service." (Novian Decl. ¶ 7 & Ex. C.)

Indeed, the word "arbitration" appears nowhere in the sign-up flow, not on the screen, not in the menu, and not in any document title. (Risch Decl. ¶¶ 6, 9–10; Gliksman Decl. ¶¶ 6, 9–10; Golan Decl. ¶¶ 6, 9–10; Carmona Decl. ¶ 6.) A consumer would first encounter it only by opening the Member Agreement (one of the seven documents) and reading to § VII.A, an acknowledgment that members are subject to the Kalshi Rulebook "including the obligation to submit to arbitration,"

a reference that states no terms. And § VII.A nowhere cites the provision Kalshi now enforces: its nod to "arbitration" corresponds to Chapter 10 of the Rulebook, the only chapter titled "Arbitration" (*see infra* § IV.A), not to Rule 11.3(d), which sits unnamed in a different chapter. To find any, the consumer would have to obtain that separate document of roughly 84 pages and read to Rule 11.3(d), a subsection of the Rulebook chapter captioned "Limitation of Liability; Time Period in Which to Bring Actions; Governing Law" (capitalization altered) (the "Limitation of Liability" chapter). (ECF No. 64-1; ECF No. 64-2.)




*Figure 3: The menu opened by the arrow: seven documents, none titled "Terms," none mentioning arbitration.* (Novian Decl. ¶ 7 & Ex. C (captured March 25, 2026, iPhone 16 Pro Max).)

The screen has not stood still. By Kalshi's own account, the operative assent language of its Member Agreement changed in December 2024. (Sottile Decl. ¶ 33.) Since this litigation began, the bottom-line text has changed again and now recites that "[b]y continuing, you acknowledge

receipt of Kalshi and Kinetic Markets LLC regulatory disclosures, and agree to applicable terms of both." (Carmona Decl. ¶ 8 & Ex. F (screen recording captured August 11, 2026).) Plaintiffs offer the current-state recording as proof of the flow's architecture and its mutability, not as a depiction of the class-period interface, which Kalshi has never produced; the still images likewise show the mobile interface Kalshi's exhibits omit, not the precise screen any one plaintiff saw. That showing is Kalshi's burden.

## II. Kalshi's Motion Does Not Proffer Any Evidence of the Mobile Phone Interfaces Plaintiffs Actually Used

Kalshi's motion rests entirely on the declaration of Xavier Sottile. (ECF No. 64.) Its exhibits are screenshots of Kalshi's website as it renders in a desktop web browser: a registration page, an email screen, a Google OAuth prompt, and login screens. (*Id.* ¶¶ 12, 17, 20–21.) Not one exhibit depicts what a mobile phone displays. Not one exhibit bears a date. The declaration does not say who captured the images, when, from what device, or how they were preserved.

For the mobile experience, the only vantage from which any plaintiff encountered Kalshi's sign-up flow, the declaration offers a single conclusory sentence: that the app experience is "the same in all relevant parts" as the website. (*Id.* ¶ 14.) This conclusory sentence is a shortcut, not evidence, and it should be rejected: the two interfaces could not be more different. *See* Figure 5.

Moreover, the declaration says nothing about how Kalshi's website renders in a browser on a phone, an interface its desktop screenshots likewise never depict. It asserts that the depicted flows have been in place "since at least January 2026" (*id.* ¶ 9), while separately admitting that the Member Agreement's assent language changed in December 2024. (*Id.* ¶ 33.) The admission matters: if Kalshi's own assent documents changed as recently as December 2024, nothing in the declaration establishes that the screens depicted are the screens in place when each plaintiff first

encountered the interface, Risch in January 2026, Gliksman in January 2026, and Golan in January 2026. (Risch Decl. ¶ 4; Gliksman Decl. ¶ 4; Golan Decl. ¶ 4.) It purports to count the plaintiffs' logins (Golan "no fewer than 4 times," Risch "no fewer than 16 times," Gliksman "no fewer than 3 times") without explaining the records behind the counts or identifying the device or screen involved in any login. (*Id.* ¶ 22.) And it claims the Arrow gives access to the User Agreements "with a single click" (*id.* ¶ 21) and that the Rulebook's hyperlinked table of contents leads to Rule 11.3 (*id.* ¶ 26), neither of which matches the sequence of screens described above.

## ARGUMENT

### I. Legal Standard

Kalshi must make a prima facie showing that an agreement to arbitrate existed, and all reasonable inferences must be drawn in favor of Plaintiffs. "[T]he party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 101–02; *accord Presson*, 2025 WL 692123, at *3 (movant's initial burden). Courts apply "a standard similar to that applicable for a motion for summary judgment," drawing all reasonable inferences in favor of the non-movant. *Nicosia*, 834 F.3d at 229–30. A plaintiff's sworn denial creates a genuine dispute of fact, *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022) (declaration disputing electronic signature sufficed to defeat the motion), and the movant may not flip the burden by demanding that plaintiffs disprove assent, *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 693 (S.D.N.Y. 2015) (motion denied where the movant failed to "make a prima facie initial showing that an agreement to arbitrate existed" (quoting *Dreyfuss v. eTelecare Glob. Sols.–US, Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009))).

No presumption of arbitrability attaches to the question of whether any agreement exists. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301–03 (2010) (the pro-arbitration

policy applies only after formation is established); *O'Callaghan v. Uber Corp.*, 2018 WL 3302179, at *5 (S.D.N.Y. July 5, 2018) (Ramos, J.) (same). "If the moving party fails to make an adequate initial showing, based on competent evidence, the motion to compel arbitration must be denied." *Marcus v. Collins*, 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016). If material facts are genuinely disputed, the statute directs that a trial be had on the issue of whether an agreement to arbitrate existed. 9 U.S.C. § 4; *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (a § 4 trial follows where formation is at issue).

## II. State Law Determines Whether an Arbitration Agreement Was Formed

### A. The Motion Fails Under Either California's or New York's Formation Rules

Formation is a question of state law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). It is also a question the Court must resolve before giving effect to any choice-of-law clause located inside the very documents whose formation is disputed. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (applying such a clause "would presume the applicability of a provision before its adoption by the parties has been established"); *Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 286–88 (S.D.N.Y. 2025) (formation analyzed under forum law notwithstanding a New York choice-of-law clause). Because *Risch* reached this Court by a convenience transfer under § 1404(a) (C.D. Cal. Dkt. 46), California's choice-of-law rules travel with it. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (transferee court applies transferor-state law after a defendant-initiated transfer); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (same).

The Court need not resolve any conflict, however. Kalshi itself contends that New York and California formation rules are materially indistinguishable (ECF No. 63 at 15), and, as discussed below, the framework this Court applied in *Presson* and *Segui* disposes of the motion under either State's law.

### B. This Court's Decisions in *Presson* and *Segui* Confirm That No Agreement Was Formed

This Court has twice declined to compel arbitration on records stronger than Kalshi's. In *Presson*, a moviegoer bought tickets through a checkout page whose only assent language was tethered to a pre-checked "Join Alamo Victory" box; the "Buy Tickets" button he actually pressed said nothing about terms. 2025 WL 692123, at *1. This Court denied the motion to compel arbitration on two independent grounds. First, a pre-checked box involves no "specific action" manifesting assent. Second, "[b]ecause the 'Buy Tickets' button is in no way connected to the linked Terms, a reasonably prudent user would not understand clicking 'Buy Tickets' to constitute agreement to the linked Terms." *Id.* at *5. *Presson* thus turned on the disconnect between the button pressed and the terms invoked; *Segui* addressed the other half of the framework, the presentation of the terms themselves. In *Segui*, this Court denied enforcement because the terms were never "presented to the offeree in a clear and conspicuous way" during enrollment. 802 F. Supp. 3d at 563–64. *Segui* arose from electronically signed financing documents rather than an app screen, but the rule it applied is not medium-specific: terms bind only when made obvious to the consumer, or called to the consumer's attention, in a clear and conspicuous way. All these grounds are present here: Kalshi's buttons read "Continue with Google," "Continue with Apple," and "Signup with Email," and, like the "Buy Tickets" button in *Presson*, none is connected, by text or placement, to the Notice Sentence; and, as in *Segui*, no operative term was ever presented clearly and conspicuously during enrollment.

Where California law differs, it is more protective of consumers, *see Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025) (ambiguous assent language defeats formation); *Godun v. JustAnswer LLC*, 135 F.4th 699, 711 (9th Cir. 2025) (notice text that blends into the background is not conspicuous), so the motion fails *a fortiori* as to the *Risch* plaintiffs. Kalshi's Notice

Sentence fails under both: it is set in the lowest-contrast type on the screen, and it frames the unnamed "legal terms" as recommended reading rather than as a contract to be formed.

**III. Kalshi Fails to Meet Its Burden of Establishing That a Valid Arbitration Agreement Existed**

An arbitration agreement, like any contract, requires mutual assent, and consumers cannot assent to terms they do not know exist. *Specht*, 306 F.3d at 29 ("Mutual manifestation of assent … is the touchstone of contract."). Kalshi does not contend that any plaintiff actually read or knowingly accepted its terms (actual notice). Its motion rests entirely on inquiry notice: the theory that a "reasonably prudent user" would have gleaned the terms' existence from the sign-up interface itself. (ECF No. 63 at 15–16.) The governing test is undisputed: absent actual notice, the movant must show (1) reasonably conspicuous notice of the terms and (2) an unambiguous manifestation of assent through an action the interface clearly warned would carry that consequence. *Edmundson*, 85 F.4th at 703–05 (setting out the two-part framework); *Wu*, 43 N.Y.3d at 302–04 (adopting *Edmundson* as New York law); *accord* ECF No. 63 at 15–16 (invoking the same framework). The three "design and content" considerations Kalshi recites alongside that test (ECF No. 63 at 16) are not a different test; they are *Edmundson*'s factors for applying it: whether the interface clearly warned that a specific action would constitute assent, where and when the notice appeared, and the parties' course of dealing. 85 F.4th at 704–05. Sections III.B, III.C, and III.E below take up each factor in turn, and each cuts against Kalshi.

Conspicuousness is what makes inquiry notice fair: the law charges consumers with terms they never read only where the design and content of the interface, taken as a whole, made their existence plain, so that ignoring them was their own choice. *Meyer*, 868 F.3d at 74–75, 78–79; *Nicosia*, 834 F.3d at 233. The parties dispute what the interface actually showed. But the decisions

Kalshi leans on most heavily (*Edmundson*, *Hu*, *Feld*, *Thorne*, and *Kern*) enforced screens bearing every feature Kalshi's screen lacks, as § III.D demonstrates case by case.

**A. Kalshi Cannot Show That the Arrow Connected Consumers to Any Operative "Terms," Much Less Terms Containing an Arbitration Clause**

Kalshi's proof fails at the threshold: nothing in its record shows that the Arrow actually delivered users to any operative terms. Before the Court reaches conspicuousness under the *Edmundson* framework, the movant must "clearly establish that the hyperlink does indeed connect users with the Terms of Use." *Resorb Networks, Inc. v. YouNow.com*, 51 Misc. 3d 975, 979–80, 30 N.Y.S.3d 506, 510–11 (Sup. Ct. N.Y. Cnty. 2016) (denying enforcement where it was unclear the phrase "Terms of Use" was a working link to the operative terms); *accord Plata v. Lands' End, Inc.*, 2024 WL 5339858, at *5 (C.D. Cal. Dec. 19, 2024) (movant failed to prove its link "actually led to the Terms of Use" at the time of the transaction); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022) (it "must be readily apparent" that the notice contains a functioning hyperlink to contractual terms).

Kalshi cannot make that threshold showing, either as to the access point (the on-screen element a user must tap to reach any terms) or as to its destination (what actually appears if the user does). The access point is the Arrow: a nondescript, unlabeled character (rendered on screen as "→") at the tail of the Notice Sentence, with no underline, no contrasting color, and no text identifying it as a hyperlink. (Carmona Decl. ¶ 6 & Ex. F; Risch Decl. ¶ 8; Gliksman Decl. ¶ 8.) The Arrow thus gives the consumer no indication of what, if anything, lies behind it: nothing marks it as tappable, and nothing connects it to a contract. Consumers cannot be on inquiry notice of terms they have no reason to know are reachable at all. Inquiry notice presupposes an interface

that makes it "readily apparent" both that a functioning hyperlink exists and that contractual terms lie behind it; an unmarked typographic character conveys neither. *Berman*, 30 F.4th at 856–57.

Further, even a consumer who tapped the Arrow would not land on anything called "Terms." The Arrow opens a menu titled "Legal stuff," a panel that rises over the sign-up screen and lists seven documents: the Member Agreement, the Rulebook, the Kalshi Klear Rulebook, the Privacy Policy, the Source Agency Trading Prohibition, the Additional Trading Prohibitions, and the Kalshi Klear Participant Agreement. (Novian Decl. ¶ 7 & Ex. C.) The Notice Sentence ("Kalshi's legal terms") names none of the seven as the operative "terms," no title in the list mentions arbitration or the word "Terms," and nothing in the menu tells a customer which document, if any, is supposed to be a contract. Moreover, the arbitration provision Kalshi invokes appears on the face of none of the seven: it sits at Rule 11.3(d) of the roughly 84-page Rulebook, and Kalshi's own theory reaches it only through an incorporation sentence buried inside the Member Agreement, while the menu lists two different rulebooks ("Rulebook" and "Kalshi Klear Rulebook") without identifying either as the document the Member Agreement incorporates.

An offeror cannot bind a consumer to terms it never identifies. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 295–96 (2d Cir. 2019) (the duty to read does not "morph into a duty to ferret out contract provisions"); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 838 (2d Cir. 2021) (notice fails where "Terms" could denote something other than contractual conditions). That is this case: Kalshi's screen names no document at all, and its menu presents seven, none identified as the operative contract, leaving consumers to ferret out for themselves which document, if any, binds them. In the taxonomy of this Circuit's district courts, Kalshi's flow is at best a "sign-in wrap," and one stripped of every feature that has ever made such a design enforceable. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399–404 (E.D.N.Y. 2015) (surveying

the categories and declining enforcement where terms were not "readily and obviously available"). The classification matters: a sign-in wrap neither displays the terms nor requires any click on them, so courts enforce one only where conspicuous notice and an express warning that a specific action will constitute assent supply what the design omits. *Berkson*, 97 F. Supp. 3d at 399–404; *Segui*, 802 F. Supp. 3d at 563–64. Kalshi's screen supplies neither the notice nor the warning.

**B. Kalshi's Notice Sentence Was Not Reasonably Conspicuous**

Conspicuousness is judged against the design and content of the entire screen. *Nicosia*, 834 F.3d at 233 (the question is "whether the design and content of that webpage rendered the existence of terms reasonably conspicuous"); *Meyer*, 868 F.3d at 75 ("clarity and conspicuousness are a function of the design and content of the relevant interface"); *Sellers*, 73 Cal. App. 5th at 477 ("the full context of the transaction is critical"). Measured against the rest of Kalshi's sign-up screen, the Notice Sentence loses every comparison that matters: it is the smallest, lowest-contrast text on the page, positioned beneath every action button, on a screen whose animated graphic is engineered to hold the eye. (Carmona Decl. ¶ 6 & Ex. F; Risch Decl. ¶¶ 5, 8; Gliksman Decl. ¶¶ 5, 8; Golan Decl. ¶¶ 5, 8.)

The Second Circuit has twice refused to enforce terms where the design of the screen defeated notice, even though each screen said more than Kalshi's says. In *Nicosia*, Amazon's checkout page told the user, in words Kalshi's screen never uses, that "[b]y placing your order, you agree" to the conditions of use; the court still refused to compel arbitration as a matter of law because the notice was "not bold, capitalized, or conspicuous" on a page displaying "between fifteen and twenty-five links," text "in at least four font sizes and six colors," and competing promotional advertisements. 834 F.3d at 236–37. Kalshi's screen carries fewer links than Amazon's checkout page, but it shares the defect that decided *Nicosia*, a notice rendered

inconspicuous by the design around it, and it lacks the express "you agree" warning that even Amazon's failing page contained. In *Starke*, the operative terms sat behind a "Terms & Conditions" hyperlink set in "some of the smallest text" in the bottom corner of a cluttered post-sale email whose second sentence assured the reader "You're all set!"; the Second Circuit refused enforcement because the interface distracted the reader from the hyperlink and nothing directed his attention to it. 913 F.3d at 285, 293–94. The *Starke* panel added that the notice's position made it "hard to escape the inference that SquareTrade hoped the reader's eye would be drawn elsewhere." *Id.* at 294. The inference is even stronger here: the element drawing the eye is not incidental content but a graphic that rewrites itself within milliseconds, and the Notice Sentence sits where the eye lands last, in the smallest and faintest text on the screen. (Carmona Decl. ¶ 6.)

The decision this Court endorsed in *O'Callaghan* is on all fours. In *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017), Judge Koeltl declined to enforce Lyft's registration-screen terms even though the user had to check a box beside an agree-to-terms sentence: the sentence was set in "the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar," and the light-blue link on a bright white background bore none of the "familiar indicia" of a hyperlink, such as underlining, bolding, or capitalization. *Id.* at 458, 466–68. In *O'Callaghan*, this Court distinguished *Applebaum* on precisely that ground: Uber's screen told the user she "MUST REVIEW" the linked terms and then required two separate "YES, I AGREE" clicks, so the interface both identified the operative documents and demanded an unmistakable act of agreement. 2018 WL 3302179, at *2, *8. And where Uber's screen commanded review, Kalshi's merely "recommend[s]" it, of terms it never names. Kalshi's screen offers less than Lyft's did: no checkbox, no "I agree" sentence, and an access point with fewer hyperlink markings still, on a screen that moves. (Risch Decl. ¶ 7; Gliksman Decl. ¶ 7; Golan Decl. ¶ 7.) Judge Pérez's recent

warning completes the picture. An interface "even marginally more cluttered" than Grubhub's uncluttered checkout page "would likely be different." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 122–23 (2d Cir. 2025) (Pérez, J., concurring). Kalshi's screen is not "marginally more cluttered" than Grubhub's. It is crowded with an animated graphic cycling from "Trade on sports" to "Trade on crypto" to "Trade on news," three competing buttons, and a login prompt. No screen in this Circuit's sign-in-wrap canon was animated at all.

The access point fares no better. A "reasonably prudent smartphone user" looks for the familiar indicia of a hyperlink, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78–79 (2d Cir. 2017), and notice therefore requires "more than mere coloring": underlining, bolding, capitalization, or words to that effect, *Applebaum*, 263 F. Supp. 3d at 467. California's rule is stricter still. Its courts hold that "[c]ustomary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters," and "[s]imply underscoring words or phrases . . . will often be insufficient." *Berman*, 30 F.4th at 856. Kalshi's declarant concedes the styling: he describes the operative text as appearing "in dark grey font against a white background." (Sottile Decl. ¶ 21.) That is an admission that the access point carries no blue, no underline, no bolding, and no capitals, the very features *Berman* requires and whose absence doomed the interfaces in *Applebaum*, *Cullinane*, and *Colgate*.

Every enforcement decision in this Circuit's sign-in-wrap canon involved conventional link styling: underlined or contrasting blue text in *Meyer*, 868 F.3d at 78, *Edmundson*, 85 F.4th at 699, and *Wu*, 43 N.Y.3d at 302–04, and bolded, contrasting hyperlinks in *Hu v. Whaleco Inc.*, 779 F. Supp. 3d 265, 274 (E.D.N.Y. 2024). The California canon that governs the *Risch* plaintiffs runs the same way: enforcement in *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 515–16 (9th Cir. 2023), rested on an express warning above each button that, by clicking it, "you agree to

our Terms of Use," with the "Terms of Use" hyperlink "written in bright blue font." Where that pairing is missing, California courts refuse enforcement, because "the full context of the transaction is critical" to inquiry notice. *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021) (declining to bind consumers to textual notices on free-trial sign-up screens).

Kalshi offers the unstyled Arrow. (Carmona Decl. ¶ 6 & Ex. F; Figure 4.) Indeed, the Arrow is not a hyperlink to any document at all: tapping it navigates nowhere, and instead unfolds the "Legal stuff" menu. Hyperlinks appear only there, in an overlay one layer removed from the sign-up screen, and the seven that appear force a second, unguided choice, because none is identified as the operative terms. (Carmona Decl. ¶ 6.) The sign-up screen itself thus never displays a direct link to any terms. Plaintiffs are aware of no decision enforcing terms reachable only through an unmarked symbol. And courts have refused enforcement on far stronger access points. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764–65 (N.D. Cal. 2019) (low-contrast hyperlinks "not conspicuous enough"); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018) (small, non-bolded link lost among more noticeable elements); *Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1038 (N.D. Cal. 2024) (notice in "the smallest print anywhere" on the page).

The words Kalshi chose would not put a reasonable consumer on inquiry notice either. Its Notice Sentence frames the unnamed "legal terms" as optional reading ("which we recommend reviewing") rather than warning that continuing constitutes agreement to identified contractual terms. *Soliman*, 999 F.3d at 837–38 (notice must signal that the consumer is agreeing, not merely invited to read); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002) (a "reference to the existence of license terms on a submerged screen is not sufficient" to create notice); *Starke*, 913 F.3d at 297 (offeror "did nothing to alert" the consumer that a hyperlink contained the operative contract).




*Figure 4: The Notice Sentence and Arrow, enlarged. As displayed on an iPhone, the sentence occupies the bottom edge of the screen in the smallest type shown; the Arrow carries no underline, color, or label.* (Novian Decl. ¶ 7 & Ex. D (captured March 30, 2026).)

And even the mythical consumer who took every step Kalshi's papers describe would still never see an arbitration clause. She would find, at most, an incorporation sentence pointing to a separate 84-page Rulebook whose arbitration provision hides in a chapter called "Limitation of Liability." Knowing consent applies "with particular force" to arbitration. *Specht*, 306 F.3d at 30. A hyperlink chain can bind only if every link in it is independently conspicuous, because "[h]yperlinks do not provide an incorporation-by-reference cure-all." *Thorne v. Square, Inc.*, 2022 WL 542383, at *10 (E.D.N.Y. Feb. 23, 2022). Kalshi's chain has five steps, and every step fails that test. Step one is the Arrow, which bears no marking of a hyperlink at all. Step two is the "Legal stuff" menu, which lists seven documents without identifying any of them as the operative terms. Step three is the Member Agreement, which a consumer must select on a guess; its § VII.A acknowledges an "obligation to submit to arbitration" but states no terms. Step four is the separate Rulebook of roughly 84 pages, nowhere presented in the flow. Step five is Rule 11.3(d), filed under a chapter captioned "Limitation of Liability" rather than under the chapter captioned "Arbitration." (ECF No. 64-1; ECF No. 64-2; Novian Decl. ¶¶ 3–5.)

In contrast, *Thorne* shows what an enforceable chain looks like: each hyperlink there was underlined or set in bold blue or bright green type, each was paired with "By entering and tapping Next, you agree" language, and the first linked document directed the reader, in its opening paragraph, to the General Terms of Service, whose own first paragraph flagged the arbitration provision. 2022 WL 542383, at *2–4, *10–11. Even then, the court cautioned that the same presentation "might undermine that notice" in a different case. *Id.* at *11 n.14. Kalshi's chain has none of those safeguards at any step.

**C. Plaintiffs Never Assented to the Arbitration Clause**

Kalshi's interface never asked Plaintiffs to do anything that signified agreement, and that omission defeats assent under this Court's own decisions. Assent requires that "the interface clearly warned the user that taking a specific action would constitute assent" to identified terms. *Presson*, 2025 WL 692123, at *5. In *Presson*, this Court declined to enforce terms because the button pressed was "in no way connected to the linked Terms," contrasting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835, 838–40 (S.D.N.Y. 2012), where the warning "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service" sat immediately below the very "Sign Up" button it named. Kalshi's three buttons read "Continue with Google," "Continue with Apple," and "Signup with Email." None mentions agreement. The Notice Sentence names no button, and its trigger ("By continuing") identifies no action at all. *Nicosia*, 834 F.3d at 236–37 (no assent as a matter of law even where the page stated "By placing your order, you agree," because clutter diluted the notice); *Schnabel*, 697 F.3d at 120–21 (assent requires conduct the offeree reasonably understands to carry that meaning). The sentence's object is equally indefinite. The phrase "Kalshi's legal terms" identifies no document among the seven in the menu, leaving consumers to guess what they were supposedly accepting. *Soliman*, 999 F.3d at 838; *cf.*

*Chabolla*, 129 F.4th at 1158 (formation defeated where the assent sentence was reasonably susceptible to a non-contractual reading).

This Court's own decisions compelling arbitration confirm the line, because each turned on an express, unmistakable act of agreement: a checkbox beside "I have read and agree" with styled links and an up-front arbitration flag, *Teta v. Go New York Tours Inc.*, 738 F. Supp. 3d 502, 506–07 (S.D.N.Y. 2024); dedicated, dated acceptance pages, *Skillern v. Peloton Interactive, Inc.*, 2022 WL 3718279, at *6 (S.D.N.Y. Aug. 29, 2022); and a "MUST REVIEW" instruction followed by two "YES, I AGREE" clicks, *O'Callaghan*, 2018 WL 3302179, at *2, *8. Kalshi's flow contains no comparable act, at sign-up or at any later login. *Segui* controls instead: where the operative terms were never made obvious or called to the consumer's attention during enrollment, there is no assent. 802 F. Supp. 3d at 563–65.

Kalshi's drafting history shows that it knows what unambiguous assent looks like. The proof sits in the recitals printed at the top of the Member Agreement document itself, not on any sign-up screen. Until December 2024, the Member Agreement's opening recital warned, in capitals, that "CLICKING THE 'I ACCEPT' BUTTON IS THE LEGAL EQUIVALENT" of manually signing. (Sottile Decl. ¶ 33.) The version in force when Plaintiffs enrolled instead recites that "CLICKING THE BUTTON TO CONTINUE PAST THIS AGREEMENT IS THE LEGAL EQUIVALENT OF MANUALLY SIGNING." (ECF No. 64-2 at 1; Sottile Decl. ¶ 32.) Kalshi abandoned the express "I ACCEPT" button it once demanded, and the recital it adopted in its place describes a screen that appears nowhere in Kalshi's exhibits: no screen in the flow presents the Member Agreement with a button to continue past it. A platform that once required "I ACCEPT," and chose to stop, cannot attribute unambiguous assent to users who were never asked. Kalshi

plainly knows how to write a capitalized warning, and it could have placed one on the sign-up screen itself; it chose instead to bury it in a document the sign-up screen never names.

**D. The Cases on Which Kalshi Relies Are Inapposite Because They Concern Materially Different Interfaces Than the Mobile Phone Application Interface at Issue Here**

Every decision Kalshi invokes enforced an interface bearing features its own screen lacks: an advisement naming the operative act ("By clicking Sign Up"; "By creating an Uber account, you agree"); conventionally styled hyperlinks (with large, often capitalized, blue, underlined text linking directly to Terms); adjacency between notice and a single assent mechanism on an uncluttered, static screen; and, typically, an arbitration flag on the face of the linked terms.

Feature by feature, the gap is stark. As to the access point: in every enforcement decision, the consumer could see there was something to click: hyperlinks in blue, in dark print set off against a bright background, in *Meyer*, 868 F.3d at 78–79; bolded blue in *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 827, 832 (S.D.N.Y. 2020); blue and underlined in *Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 245 (S.D.N.Y. 2024); "offset in bright blue font" in *Kern v. StubHub, Inc.*, 2024 WL 5283923, at *1 (S.D.N.Y. Dec. 17, 2024); an underlined and bolded "payment terms" link in *Edmundson*, 85 F.4th at 699, 706; and bolded, dark-gray links that contrasted with both the lighter text around them and the white background in *Hu*, 779 F. Supp. 3d at 274, 289–90. Kalshi's sole access point is a bare arrow with no color, no underline, no capitals, and no label.

And where the styling fell short, courts denied enforcement: a small, non-bolded link diminished by more noticeable elements in *Cullinane*, 893 F.3d at 64; low-contrast links in *Colgate*, 402 F. Supp. 3d at 764–65; an underscore alone in *Quamina*, 721 F. Supp. 3d at 1038. The margin is thin even when styling is present: examining the very Temu screen enforced in *Hu*, another court denied enforcement because the bolded link sat "spatially decoupled" from the

attention-grabbing "Continue" button. *Eakins v. Whaleco, Inc.*, 721 F. Supp. 3d 1252, 1259 (W.D. Okla. 2024); *see Hu*, 779 F. Supp. 3d at 278–79, 290–92 (acknowledging the contrary decisions).

Warning language divides these cases from Kalshi's screen even more sharply. Every enforced screen told the consumer, in words, that a named action would bind: "By clicking Sign Up," *Fteja*, 841 F. Supp. 2d at 835; "By creating an Uber account, you agree," *Meyer*, 868 F.3d at 76; "By clicking the Sign Up or Facebook button, you agree," *Feld*, 442 F. Supp. 3d at 827; "[b]y clicking the button," the user "acknowledge[s] and accept[s]" the terms, *Kern*, 2024 WL 5283923, at *1; "I agree to the payment terms," placed directly above the lone "Confirm and continue" button, *Edmundson*, 85 F.4th at 699, 706. Several of the enforced screens paired that warning with an affirmative act of assent, from the checkboxes in *Wu* ("By checking the box, I have reviewed and agreed," 43 N.Y.3d at 293) and *Teta*, 738 F. Supp. 3d at 506–07, to the two "YES, I AGREE" clicks in *O'Callaghan*, 2018 WL 3302179, at *2. Kalshi's flow supplies neither. And even an express warning is not sufficient. In *Nicosia*, *Cullinane*, *Colgate*, and *Sellers*, the screen said "you agree," and enforcement still failed on the remaining deficiencies. 834 F.3d at 236–37; 893 F.3d at 57, 64; 402 F. Supp. 3d at 763; 73 Cal. App. 5th at 453, 477. Kalshi's sentence offers only a diluted echo of the feature those denials treated as merely a starting point.

Placement and specificity widen the gap further. The enforced screens named the operative document and put the notice where the action was: "directly above" the operative button in *Hastings*, 724 F. Supp. 3d at 245, *Kern*, 2024 WL 5283923, at *1, and *Oberstein*, 60 F.4th at 515–16, and "immediately below" it in *Fteja*, 841 F. Supp. 2d at 835. And they did so on uncluttered screens. *Meyer*, 868 F.3d at 78; *Feld*, 442 F. Supp. 3d at 831; *Hu*, 779 F. Supp. 3d at 288. Kalshi's flow names no document, ties its sentence to no button, and parks it in tiny font at the bottom edge of an animated screen.

The comparison is not close. Kalshi's screen has no named button, no styled link, no static layout, and no document called "Terms" anywhere in the flow. And where every enforced flow led to terms that flagged arbitration on their face, often in bold capitals on the first page, *Feld*, 442 F. Supp. 3d at 827–28; *Kern*, 2024 WL 5283923, at *1; *Hu*, 779 F. Supp. 3d at 274–75, Kalshi's flow leads to seven documents, none identified as the operative terms, and an arbitration provision reachable only through a second layer of incorporation.

**E. The Number of Times Plaintiffs Logged In to the Kalshi Platform Is Irrelevant to Whether Kalshi's Platform Gave Conspicuous Notice of the Arbitration Clause**

Kalshi's login tallies (Sottile Decl. ¶ 22) add nothing. Sottile does not attest that any plaintiff ever saw the login text; he infers only that Plaintiffs "would have seen" it "[d]ue to the flow" of the platform, resting on account "records" that are neither attached nor authenticated. (Sottile Decl. ¶ 22.) Golan, for his part, recalls no notice of contract terms, and no request to agree to anything, at any of his logins. (Golan Decl. ¶ 11.) And even taken at face value, they prove nothing, because repetition of an inconspicuous notice is not notice. *Starke*, 913 F.3d at 296 (receipt of "the same inconspicuous hyperlink" on repeated occasions did not create notice, even after six prior transactions); *Edmundson*, 85 F.4th at 705 (embedding that rule in the third assent factor). Imputation presupposes a prior exposure that actually created awareness. *Schnabel*, 697 F.3d at 124–25 (notice received after the fact does not bind); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401–03 (2d Cir. 2004) (repeated exposure matters only where the user actually learned of the terms).

Courts have credited repeated logins only where the notice the consumer re-encountered was itself conspicuous: a change-flagged, capitalized login notice in *Picha v. Gemini Trust Co.*, 2024 WL 967182, at *9 (S.D.N.Y. Mar. 5, 2024); bolded contrasting links at every login in *Hu*,

779 F. Supp. 3d at 274, 295; and affirmative dated acceptance clicks in *Skillern*, 2022 WL 3718279, at *6. Sixteen defective notices are not one adequate notice. *Linders v. Festival Fun Parks, LLC*, 830 F. Supp. 3d 277, 300 (D. Conn. 2026) (repetition of inconspicuous terms "weighs against" a finding of notice), *appeal pending*; *Colgate*, 402 F. Supp. 3d at 762, 765 (no notice although consumers "created or logged into" accounts through the same screens).

**F. Kalshi's Evidence Is Inadmissible and Insufficient**

Kalshi's submission fails on its own terms before any of the above is reached, for a threshold reason: the evidence offered to prove formation is undated, unauthenticated, and unsupported by personal knowledge. Because the motion is adjudicated under a summary-judgment standard, the evidence supporting it must be admissible: authenticated, and grounded in the declarant's personal knowledge. c, 901(a); *cf.* Fed. R. Civ. P. 56(c)(2), (4). Courts decline to compel arbitration on undated screenshots unaccompanied by an affidavit attesting to their origin. *Berger v. JetBlue Airways Corp.*, 2024 WL 4107243, at *4 (E.D.N.Y. Sept. 6, 2024) (refusing to rely on undated website screenshots to establish notice or assent); *Kelly Toys Holdings, LLC v. Top Dep't Store*, 2022 WL 3701216, at *8 (S.D.N.Y. Aug. 26, 2022) (declining to credit undated screenshots as proof of a website's content at the relevant time). Every Sottile exhibit is undated. None is tied to any plaintiff. The declaration identifies neither the person who captured the images nor when, and Sottile, Kalshi's "Head of Markets," nowhere attests to personal knowledge of how the exhibits were created or preserved. (ECF No. 64 ¶¶ 1, 12, 17, 20–21.) Plaintiffs accordingly object under Rules 602 and 901 to the Sottile Declaration's interface exhibits and to the paragraphs describing them, and the Court should disregard both.

The exhibits also depict the wrong platform. Each plaintiff signed up on a mobile phone; every exhibit is a desktop-website capture. The only bridge is Sottile Decl. ¶ 14's conclusory

assertion that the app is "the same in all relevant parts," which is the precise attestation *Snow* rejected. A representation that the disclosures' text was identical "is of little help" because it says nothing about "the overall design," and design decides conspicuousness. 2020 WL 6135990, at *5. *Accord Zachman*, 49 F.4th at 103 (requiring visual evidence of the interface the plaintiff actually used); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 934 (N.D. Cal. 2024) (declining to credit a textual description of visual elements). The differences here are anything but cosmetic. The app screen is animated, its notice is set in low-contrast text on a colored field, and its only access point is an unstyled arrow. (Carmona Decl. ¶ 6 & Ex. F.)

The two platforms do not even present the same documents. The website pop-up depicted in Kalshi's papers lists *six* documents, with a single "Trading Prohibitions" entry and no heading. (Sottile Decl. ¶¶ 13, 18.) The app presents *seven* documents, including two separate trading-prohibition documents, under a "Legal stuff" header that appears nowhere in Kalshi's exhibits. (Novian Decl. ¶ 7 & Ex. C.)

The flows also diverge at the second step of registration, on Kalshi's own account: an email sign-up leads to a second screen bearing the same grey notice (Sottile Decl. ¶¶ 16–18); a Google sign-up leads to a Google interstitial stating only that the user "can review" Kalshi's "privacy policy and terms of service," with the link running to the Member Agreement alone, not the Rulebook (*id.* ¶¶ 19–20); and an Apple sign-up is never depicted or described at all (*id.* ¶ 15). The declaration never identifies which path any plaintiff took. Golan signed up through "Continue with Google" on his Android phone (Golan Decl. ¶ 7), and Kalshi's desktop Google-interstitial exhibits do not depict that flow as it appears on Android. If any plaintiff registered through Apple, Kalshi has offered no evidence whatsoever of the screens that plaintiff saw. Nor is there any evidence of

the Android application through which Golan enrolled. (Golan Decl. ¶ 4 (account created through the app downloaded from the Google Play Store onto a Google Pixel 10 Pro).)




*Figure 5: Left: the website screen Kalshi filed in the Sottile Decl. ¶12. Right: the mobile sign-up screen (Figure 1). Kalshi calls these "the same in all relevant parts."* (Sottile Decl. ¶ 14.)

Moreover, Kalshi cannot tie its exhibits to the class period. Its own papers establish that the interface is a moving target. The Member Agreement's assent language changed in December 2024 (Sottile Decl. ¶ 33), and the sign-up screen has changed again since this litigation began, now naming "Kinetic Markets LLC" and the "applicable terms of both." (Carmona Decl. ¶ 8.) A movant that controls the only evidence of its interface must show when its screens changed and which version each plaintiff saw. *Snow*, 2020 WL 6135990, at *5 (movant must supply the dates its screens changed to connect exhibits to the plaintiff's transaction); *cf. Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 264–69 (M.D.N.C. 2016) (discounting declarations where the movant

had exclusive possession of the electronic record). Kalshi has shown neither. Its assertion that the depicted flows existed "since at least January 2026" (¶ 9) is unmoored from any dated exhibit.

The declaration's account of navigation is sanitized in the same way. It claims access "with a single click" (¶ 21) and a hyperlinked table-of-contents path to Rule 11.3 (¶ 26), but the actual flow runs from an unstyled arrow, to a seven-document menu, to the Member Agreement, to an incorporation sentence, to a separate 84-page Rulebook, to a subsection of its "Limitation of Liability" chapter. The Court is respectfully invited to walk that flow itself. (Carmona Decl. ¶¶ 5–7 & Ex. F (screen recording lodged on portable media with the courtesy copy, per Individual Practice 1.G).)

Kalshi chose this record, and it should be held to it. It cannot repair these defects with a new declaration on reply, to which Plaintiffs would have no opportunity to respond. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *Dawson v. Target Corp.*, 2025 WL 1651940, at *2–3 (N.D. Cal. June 11, 2025) (sustaining objection to new screen-interface evidence submitted with a reply in support of a motion to compel arbitration, striking the supplemental declaration in relevant part, and disregarding the arguments that relied on it); *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden.").

## IV. Even If Kalshi Could Establish That Plaintiffs Assented to the Platform's "Terms" (Plaintiffs Did Not), Those Terms Do Not Compel Arbitration of Plaintiffs' Claims

Kalshi's motion does not invoke the chapter of its Rulebook captioned "Arbitration," because it cannot: Chapter 10 makes arbitration elective and reaches only disputes between traders.

(ECF No. 64-1, Rule 10.1(a).) The motion instead rests on a lone sentence in the chapter captioned "Limitation of Liability," Rule 11.3(d), directing arbitration "in accordance with the rules of this chapter," a chapter that contains no arbitration rules. (*Id.*, Rule 11.3(d) (capitalization altered).) Either that command cannot be performed, or it reaches back to the elective chapter Kalshi cannot invoke; on either reading, these "Terms" compel nothing.

**A. The Rulebook's Only Arbitration Chapter Makes Arbitration Elective, and Kalshi Cannot Invoke It**

Kalshi's Rulebook devotes one chapter—Chapter 10, captioned "Arbitration"—to the subject of arbitration, and that chapter defeats the motion. Chapter 10 applies "[i]f so elected by a Participant." (ECF No. 64-1, Rule 10.1(a).) The Rulebook defines "Participant" as "a Self-Clearing Member, an FCM, an IB, an FCM Customer, and/or an IB Customer," a list of market intermediaries and their customers that does not include the exchange itself. (ECF No. 64-1, Definitions.) The election thus belongs to a participant, not to Kalshi, and no plaintiff has elected anything. Chapter 10 is also confined to "Claims" between participants arising out of a Kalshi contract, and Kalshi, the exchange, is not a "Participant" under that definition. (ECF No. 64-1, Rules 10.1(a), (e).) The one place Kalshi's documents actually provide arbitration procedures, in other words, they provide them for a different kind of dispute, at the customer's option alone.

Kalshi's memorandum never addresses this text. Indeed, it never cites Chapter 10 at all. The only Rulebook chapter captioned "Arbitration" appears nowhere in Kalshi's memorandum, which instead rests entirely on Rule 11.3(d) of the "Limitation of Liability" chapter. The Member Agreement provision Kalshi itself quotes points the same way. Section XX directs that any dispute "will be settled in accordance with the procedures set forth in the Kalshi Rulebook." (ECF No. 63 at 10 (quoting ECF No. 64-2, § XX).) The only dispute-resolution procedures set forth anywhere

in the Rulebook are Chapter 10's, and they are elective and confined to disputes between participants; Chapter 11 sets forth none. The provision Kalshi quotes points directly to the chapter its memorandum will not cite.

**B. Federal Law Requires That Exchange Arbitration Be Voluntary for the Customer**

The elective design is no accident of drafting. It is the regulatory architecture of a designated contract market. Since Congress created the CFTC in 1974, the Commodity Exchange Act has required that exchange arbitration be voluntary for the customer. The Supreme Court, describing the original provision, put it plainly: "the use of the procedure by a trader is voluntary." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 385 (1982). The Second Circuit said the same, holding that exchange dispute-settlement procedures "are expressly made voluntary by the Act," and "the aggrieved trader is in no sense compelled" to use them. *Leist v. Simplot*, 638 F.2d 283, 313 (2d Cir. 1980) (Friendly, J.), *aff'd sub nom. Curran*, 456 U.S. 353; *accord Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1179 (2d Cir. 1977) (the Act "prohibited a surrender of private remedies through an agreement to arbitrate which was not voluntary").

That command remains current law. The Act still provides that the use of a futures association's arbitration procedure "by a customer shall be voluntary," 7 U.S.C. § 21(b)(10), and for designated contract markets the requirement now runs through Core Principle 14, which requires a designated contract market to maintain dispute-resolution procedures for market participants, 7 U.S.C. § 7(d)(14); 17 C.F.R. §§ 38.750–38.751, and the Commission's implementing guidance directs that "[t]he use of dispute settlement procedures shall be voluntary" for retail customers, 17 C.F.R. pt. 38, app. B, Core Principle 14(b)(2); *see also Geldermann, Inc. v. CFTC*, 836 F.2d 310, 312–14 (7th Cir. 1987) (construing Core Principle 14's predecessor,

former CEA § 5a(11): exchange arbitration "shall be voluntary" for the customer, while the member must submit if the customer elects); 17 C.F.R. § 166.5.[1]

Kalshi wrote Rule 10.1(a) the way it did because it believed federal law required it to. Having drafted an elective arbitration chapter to keep its CFTC designation, Kalshi cannot now read the word "elected" out of its own Rulebook to conscript the very customers the rule was written to protect. *Cf. L&R Farm P'ship v. Cargill Inc.*, 963 F. Supp. 2d 798, 804 (W.D. Tenn. 2013) (whether an arbitration clause conforms to the CEA's voluntariness requirements is a validity question for the court).

**C. Rule 11.3(d) Purports to Compel Arbitration Under Chapter Rules That Do Not Exist**

That leaves the provision Kalshi actually invokes, Rule 11.3(d), a subsection of the chapter titled "Limitation of Liability." It directs that disputes be arbitrated "in accordance with the rules of this chapter." (ECF No. 64-1, Rule 11.3(d) (capitalization altered).) But Chapter 11 contains no arbitration rules. No procedures, no method of selecting an arbitrator, no seat, no timeline, nothing. Kalshi's motion quotes Rule 11.3(d) but never explains how a command to arbitrate "in accordance with" nonexistent rules can be performed, and the omission should be treated as a concession.

Nor can the subsection's trailing catch-all, "and other rules of Kalshi, if applicable," supply what the chapter lacks. This Court recently confined precisely this kind of arbitration-adjacent catch-all to its specific antecedents. *SlackPass, Inc. v. Frosted, Inc.*, 2026 WL 878691, at *2 (S.D.N.Y. Mar. 31, 2026) (Ramos, J.) (applying *ejusdem generis* to read a residual "otherwise"

[1] Plaintiffs invoke the CEA and the Commission's regulations as interpretive context for Kalshi's own Rulebook: the voluntariness command explains why Chapter 10 makes arbitration elective and confirms that reading. Plaintiffs do not contend that the CEA supplies the rule of decision on this motion; they do not concede that the CEA, the Commission's regulations, or Kalshi's status as a designated contract market preempts, precludes, or displaces any of their claims; and they expressly reserve all arguments in opposition to any such contention. The Act itself forecloses the premise: its reparations and exchange-arbitration procedures "were not intended to be exclusive of the implied judicial remedy," and its § 2(a)(1) saving clause evidences "legislative intent to preserve the implied private remedy." *Curran*, 456 U.S. at 385–86.

clause in light of the specific terms preceding it), *appeal pending*. And reading the catch-all to smuggle in Chapter 10 would only collide with Chapter 10's own design, which is elective and limited to participant-versus-participant disputes. And if the interlocking texts leave any ambiguity, it is construed against Kalshi, which drafted every word of them. *See Applebaum*, 263 F. Supp. 3d at 464 (New York requires "clear, explicit and unequivocal" agreement to arbitrate). The Member Agreement itself contemplates that disputes may be resolved "by a court or arbitrator." (ECF No. 64-2, § X.)

Even read as a valid agreement to arbitrate before a Kalshi-designed mechanism, Rule 11.3(d) would fail for a second, independent reason: the Federal Arbitration Act does not let a court construct the forum Kalshi never built. Section 5 permits a court to fill a lapse or vacancy in the naming of an arbitrator, 9 U.S.C. § 5, but not "to circumvent the parties' designation of an exclusive arbitral forum." *In re Salomon Inc. S'holders' Derivative Litig.*, 68 F.3d 554, 561 (2d Cir. 1995). *Salomon* refused to appoint a substitute arbitrator where the parties had agreed to arbitrate "in accordance with the Constitution and rules then obtaining of the [NYSE]" and that mechanism proved unavailable. *Id.* at 558–61. Rule 11.3(d) commands the same thing in the same form, directing arbitration "in accordance with the rules of this chapter." The Second Circuit reaffirmed the *Salomon* rule in *Moss v. First Premier Bank*, 835 F.3d 260, 265–66 (2d Cir. 2016), holding that where the parties agreed to arbitrate only before the designated mechanism, its unavailability precludes an order compelling arbitration, and Section 5 supplies no substitute forum. That rule applies with extra force here. The forum in *Moss* at least existed once; Kalshi's chapter rules never did. Section 5 lets a court fill a vacancy in a forum the parties actually created; it does not let the Court create the forum Kalshi never did.

**D. Plaintiffs' Claims Do Not Arise Out of Kalshi's "Terms" and Therefore Cannot Be Compelled to Arbitration**

Section 2 of the FAA extends only to a written provision "to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. The Supreme Court reads that text to require "a causal relationship" between the claim and the contract containing the clause. *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022). Applying that limit, the Second Circuit held last year that statutory claims which "have nothing to do with" a plaintiff's individualized use of a platform do not arise out of the platform's user agreement. *Davitashvili*, 131 F.4th at 119. Other courts agree. *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1212–13 (11th Cir. 2021) (§ 2 reaches only disputes that are an immediate, foreseeable result of performing the contract); *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 721–23 (9th Cir. 2020) (O'Scannlain, J., concurring) (collecting authority); *DeSimone v. Select Portfolio Servicing, Inc.*, 748 F. Supp. 3d 136, 156–57 (E.D.N.Y. 2024) (statutory claims "arise directly outside of" the parties' agreements); *Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 368–69 (S.D.N.Y. 2022) (declining to compel statutory claims that did not arise from the agreement).

Plaintiffs' consumer-protection claims arise from statute, not from any Kalshi contract. They challenge Kalshi's decision to strip winning positions from the Khamenei market through a so-called death carveout, and the platform-wide representations that induced consumers to trade. Those claims assert statutory rights that exist independent of any Kalshi document; the complaints plead them without asserting a single right or duty under the Member Agreement or Rulebook. The Second Circuit's test for that posture is settled. Claims do not "arise out of" a contract where the plaintiff "has asserted no rights or duties under that contract" and the case can be stated without reference to it. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 390–91 (2d Cir. 2007); *see also Wright*

*v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 78–79 (1998) (claim arising from a statute, not from the agreement, is not covered by its arbitration provision). The complaints' contract-based counts do not alter the analysis. The contract those counts enforce is the Khamenei market contract itself, the instrument Kalshi wrote, listed, and settled, not the Member Agreement or the Rulebook in which Kalshi locates its arbitration clause; as to those documents, Plaintiffs assert no right and allege no breach. *Phillips*, 494 F.3d at 390–91 (claims "arise out of" a contract only where the plaintiff asserts rights or duties under that contract).

Kalshi's description of Rule 11.3(d) makes the point for Plaintiffs. Its memorandum calls the rule "the paradigm of a broad clause." (ECF No. 63 at 19 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).) But the clause in *Collins & Aikman* reached "any claim or controversy arising out of or relating to the agreement," and it was that relational language that made it permissibly broad. 58 F.3d at 20. Rule 11.3(d) contains no relational language at all: it purports to reach "any action" against a Kalshi Party, unmoored from any contract or transaction. Breadth without a relational anchor does not cure the § 2 problem; it *is* the § 2 problem.

**V. The Issue of Arbitrability Is for the Court, Not an Arbitrator, to Decide**

Kalshi's memorandum hints a delegation argument in its quotation from *Preston v. Ferrer*, 552 U.S. 346, 349 (2008), for the proposition that "questions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance." (ECF No. 63 at 20–21.) *Preston* presupposes two things Kalshi does not have. The first is a formed agreement: whether any contract exists is always for the court, and that question can never be delegated. *Granite Rock*, 561 U.S. at 301–03; *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250–51 (2d Cir. 2019) (delegation presupposes a contract, so formation cannot be sent to the arbitrator).

The second is a clear and unmistakable delegation clause: arbitrators decide arbitrability only when the parties' agreement says so. *First Options*, 514 U.S. at 944 (requiring "clear and unmistakable" evidence). Kalshi's documents contain no delegation clause, name no administrator, and incorporate no institutional rules, *cf. Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (incorporation of rules empowering the arbitrator to decide arbitrability can supply the required evidence). Nor can Kalshi route around the challenges in § VI: where a plaintiff contends the arbitration scheme itself is pervasively unconscionable, the court decides. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019) (court properly decides such a challenge).

## VI. Kalshi's Arbitration Scheme Is Arbitration in Name Only, Unconscionable, and Illusory

### A. A Kalshi-Judged, Kalshi-Funded Forum Is Not Arbitration Under the FAA

What Kalshi labels arbitration is a proceeding Kalshi controls at every step. Kalshi convenes the panel. (ECF No. 64-1, Rules 10.2(c), 10.5(a).) The fees are payable to Kalshi, by non-refundable check. (ECF No. 64-1, Rule 10.2(b).) And if the panel's composition falters, Kalshi's own Regulatory Oversight Committee "may substitute a new member for the arbitration panel or act as the arbitration panel," provided the substitute or the Committee "does not have a direct interest (financial, personal or otherwise) in the matter." (ECF No. 64-1, Rule 10.5(f).) The disinterest proviso is no answer, because the Regulatory Oversight Committee is a standing committee of Kalshi's Board. (ECF No. 64-1, Rule 2.6.) No neutral administrator exists, no external rules govern the proceeding beyond an arbitrators' ethics code (ECF No. 64-1, Rule 10.5(d) (adopting the ABA/AAA Code of Ethics for Arbitrators)), no appeal lies within Kalshi,

and no record of the proceeding is kept unless a party pays for one. (ECF No. 64-1, Rules 10.2(j)–(k).)

The Second Circuit confronted this design last year and called it what it is: "arbitration in name only." *Flores v. New York Football Giants, Inc.*, 150 F.4th 172, 181–86 (2d Cir. 2025), *cert. denied*, 2026 WL 1463191 (U.S. May 26, 2026) (a dispute-resolution scheme controlled and decided by the defending party falls outside the FAA's protection, independently fails under the effective-vindication doctrine, and, where the defect pervades the scheme, is invalid in its entirety). On reconsideration following that decision, the district court disposed of the rejoinder Kalshi will likely offer here: "Adding some procedure . . . does not fix the forum's lack of independence." *Flores v. NFL*, 2026 WL 407884, at *7 (S.D.N.Y. Feb. 13, 2026) (denying the motion to compel in full), *reconsideration denied*, 2026 WL 2044126 (S.D.N.Y. July 15, 2026), *appeal docketed*, No. 26-654 (2d Cir. Mar. 17, 2026). Chapter 10's procedural trappings cannot launder a forum that Kalshi convenes and funds and that Kalshi's own committee may staff. The defect here is not a term of the deal; it is the forum's structural dependence on Kalshi, and it infects every dispute the clause would reach.

**B. Kalshi's Dispute Resolution Scheme Is Unconscionable Under New York and California Law**

The same features condemn the scheme under state law. New York asks whether a contract term is procedurally and substantively unconscionable on a flexible, sliding scale, *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (setting out the framework), and substantive unconscionability alone can suffice in an exceptional case, *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 341–42 (W.D.N.Y. 2017) (denying arbitration on substantive unconscionability alone). Here the substance is a forum Kalshi convenes, with its own committee as backstop arbitrator, fees

flowing to Kalshi, prevailing-party fee-shifting against consumers (ECF No. 64-1, Rule 10.1(c)), a two-year claims bar (ECF No. 64-1, Rule 11.3(b)), and a unilateral right to rewrite all of it at any time (ECF No. 64-2, § VII(E)).

New York courts refuse to enforce arbitration mechanisms built to deter and disadvantage the weaker party. *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 254–55 (1st Dep't 1998) (arbitration scheme whose cost structure effectively barred consumer claims was substantively unconscionable); *see also Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938–40 (4th Cir. 1999) (rules "so one-sided" that the promulgator created "a sham system" unworthy of the name arbitration); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005) (clauses unenforceable where consumers had no reasonable way to know they were "forfeiting their rights" in pending litigation). California, whose law protects the *Risch* plaintiffs, requires bilateral fairness in consumer arbitration and condemns one-sided schemes. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 102–03, 117–18 (2000) (arbitration must provide a neutral arbitrator and may not be crafted to advantage the drafter); *accord Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670, 676 (9th Cir. 2024) (arbitration agreement and delegation clause crafted by a ticketing platform held "unconscionable and unenforceable under California law").

Kalshi's likely fallback is severance, excising the worst terms and compelling what remains. *Flores* forecloses it. Where the central defect is the forum's lack of independence, there is nothing to sever, because the scheme itself, not a stray clause, is what fails. 150 F.4th at 181–86. Neither document's drafting helps Kalshi either. The Rulebook contains no severability clause at all, and the Member Agreement's boilerplate clause (ECF No. 64-2, § XVI) presupposes a discrete offending term that can be excised. Where the defect is the identity of the tribunal and the

scheme is "permeated" by unconscionability, the court may refuse enforcement outright rather than sever. *Armendariz*, 24 Cal. 4th at 122–25. A court cannot blue-pencil Kalshi's hand-picked oversight committee into a neutral.

**C. Kalshi's Purported Arbitration Agreement Is Illusory**

Member Agreement § VII(E) provides: "This Agreement may be amended unilaterally by Kalshi upon notice to You. You will be deemed to agree to each such amendment if You do not terminate this Agreement prior to the effective date of the amendment." (ECF No. 64-2, § VII(E).) Three features of that clause do the work. The power is unilateral: notice is all a member ever receives. The assent is manufactured: silence is deemed agreement. And nothing spares the arbitration provisions: the clause reaches every term of the Agreement, including § VII.A, the very sentence that incorporates the Rulebook where Rule 11.3(d) sits. A promise to arbitrate housed in an instrument the drafter can rewrite at will is illusory. *Flores v. NFL*, 658 F. Supp. 3d 198, 214–15 (S.D.N.Y. 2023) (arbitration under a unilaterally amendable constitution was an illusory promise), *aff'd*, 150 F.4th 172 (2d Cir. 2025). New York law saves such promises only where the modification power expressly spares the arbitration agreement, and Kalshi's does not. *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 340–42 (S.D.N.Y. 2014) (promise not illusory only because the change-at-will clause "expressly excluded the arbitration agreement"); *cf. Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 107–08 (E.D.N.Y. 2015) (enforcing only where changes required notice, opt-out rights, and renewed acceptance).

California is harsher still. *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1465 (2012) (arbitration promise subject to retroactive unilateral modification is illusory). Kalshi's clause fails every one of those tests: it excludes nothing, it offers no opt-out short of quitting the platform, and it nowhere limits amendments to prospective effect. And if Kalshi responds that

illusoriness is a question for the arbitrator, that argument depends on a delegation clause it does not have. *Toth v. Everly Well, Inc.*, 118 F.4th 403, 415–16 (1st Cir. 2024) (illusoriness went to the arbitrator only because the agreement contained an express delegation provision); *see supra* § V.

**VII. The Non-Signatory Defendants Cannot Compel Arbitration**

**A. Kalshi's Own Definition of "Kalshi Parties" Excludes the Non-Signatory Defendants**

None of the four affiliate defendants is a signatory to the Member Agreement, and the definitional term on which their motion rests does not name them. The Rulebook's arbitration-adjacent definition of "Kalshi Parties" reaches officers, directors, employees, agents, and service providers, and conspicuously omits affiliates, subsidiaries, and parents. (ECF No. 64-1, Rule 11.3(a).) The omission was a choice. Where Kalshi wanted its corporate family covered, it said so, extending Member Agreement provisions to its "affiliates" by name in three separate sections, and in one of them to "subsidiaries" as well. (ECF No. 64-2, §§ X, XI, XIV.) Under settled interpretive principles, the express inclusion of affiliates in three provisions and their exclusion from the arbitration definition means what it says. *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403–04 (1984) (applying *inclusio unius est exclusio alterius* to a contract: a provision's specification of certain covered categories is read to exclude those left out); *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission"). And the Member Agreement forecloses the workaround; § XV disclaims third-party beneficiaries outright. (ECF No. 64-2, § XV.)

**B. The Non-Signatory Defendants Cannot Invoke Equitable Estoppel**

Estoppel cannot rescue the affiliates. First, the doctrine presupposes an enforceable agreement; if no contract formed, there is nothing to estop Plaintiffs from avoiding. *Alemayehu*,

934 F.3d at 250–51. Second, under New York law, estoppel requires both claims founded in the contract and a corporate relationship the plaintiff knew of when contracting, and courts deny it where either is missing. *Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 640–43 (S.D.N.Y. 2020) (denying non-signatory estoppel on the relationship prong), *aff'd*, 6 F.4th 400 (2d Cir. 2021).

Both of New York's requirements fail here. The claims are founded on consumer-protection statutes and on Kalshi's platform-wide representations, not on any right or duty created by the Member Agreement or Rulebook, and the complaints are stated without reference to either document. And nothing in the sign-up flow disclosed that KalshiEX was affiliated with Kalshi Inc., the Kalshi Klear entities (Kalshi Klear LLC and Kalshi Klear Inc.), or Kalshi Trading (Kalshi Trading LLC) at all, much less that those entities would later claim the benefit of its terms. *Trump Corp.* denied estoppel on precisely that ground: because the plaintiffs "were not aware" of the defendants' concealed affiliation with the signatory, no relationship among the parties made it unfair to let the plaintiffs keep their claims in court. 453 F. Supp. 3d at 641–43.

Third, under California law, which governs the *Risch* plaintiffs, estoppel requires that the claims rely on the contract's terms, not merely relate to the relationship it created, and California courts have refused to extend it to corporate affiliates on facts stronger than these. *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 229–31 (2009) (claims must depend on the agreement's terms); *accord Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 946–50 (9th Cir. 2022) (estoppel fails where the plaintiff's statutory claims arise independently of the contract). In *Goldman*, investors sued KPMG and the law firm behind a fraudulent tax-shelter scheme; neither was a party to the LLC operating agreements that contained the arbitration clauses. Estoppel failed because the nonsignatories could not "cite a single term or obligation" of those agreements on which the claims depended: the agreements were "merely a procedural and collateral step" in the scheme. 173 Cal.

App. 4th at 218, 229–30. The Member Agreement and Rulebook play the same collateral role here: formalities of account creation, not the source of the deception alleged. Plaintiffs' consumer-protection claims assert statutory rights; they neither plead nor depend on any term of either document.

**C. The Clearinghouse Defendants' Own Rulebook Chooses This Court**

The Kalshi Klear entities face a further problem: their own governing document chooses court. Kalshi Klear LLC, the clearinghouse for the Kalshi exchange, operates under a separate governing document, the Kalshi DCO Rulebook, which Kalshi publishes on its own website. (Novian Decl. ¶ 6 & Ex. A (Kalshi DCO Rulebook v.1.4).) Rule 13.5 of that document, titled "Legal Proceedings," provides that "[a]ny action, suit or proceeding against the Company" and its personnel "shall be brought in the State or Federal courts located within the City of New York," with each participant's express consent to jurisdiction and a jury waiver. (*Id.* R. 13.5.A.) The contrast with Rule 11.3(d) is instructive. When Kalshi's corporate family intends to designate a dispute forum, it knows exactly how: it names the courts, secures consent to their jurisdiction, and spells out the waiver, with every formality the sign-up flow lacks. The clearinghouse defendants cannot compel arbitration under a rulebook whose arbitration definition excludes them while the rulebook they operate under sends "[a]ny action" against them to this Court.

**CONCLUSION**

For each of the independent reasons shown above, the Court should deny Defendants' motion to compel arbitration or, in the alternative, deny it pending a trial of the formation question under 9 U.S.C. § 4, or discovery limited, as in *Segui*, to the issue of contract formation. *Bensadoun*, 316 F.3d at 175; *Segui II*, 2026 WL 1724022, at *3.

Dated: August 12, 2026

Respectfully submitted,

By: */s/ Matthew Novian*

Matthew Novian (pro hac vice admitted)
Lauren Woodland (pro hac vice admitted)
Cody Fisher (pro hac vice forthcoming)
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, CA 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222
fisher@novianlaw.com
Laurenw@novianlaw.com
matthew@novianlaw.com

*Attorneys for Plaintiffs in the Risch Action*

Dated: August 12, 2026

By: */s/ Brett R. Cohen*

Brett R. Cohen
**LEEDS BROWN LAW, P.C.**
134 Mineola Boulevard, 2nd Floor
Mineola, New York 11501
Telephone: (516) 873-9550
bcohen@leedsbrownlaw.com

Daniella Levi
**DANIELLA LEVI & ASSOCIATES, P.C.**
159-16 Union Turnpike, Suite 200
Fresh Meadows, New York 11366
Telephone: (718) 380-1010
daniellalevi@levilawny.com

*Attorneys for Plaintiff in the Golan Action*

## CERTIFICATE OF COMPLIANCE

*Golan v. KalshiEX LLC, et al.*, No. 1:26-cv-02394-ER; *Risch, et al. v. KalshiEX LLC, et al.*, No. 1:26-cv-04734-ER

Pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and the Court's August 4, 2026 Order (*Risch* ECF No. 66), the undersigned certifies as follows:

1. Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration complies with the formatting requirements of Local Civil Rule 7.1 and Rule 2.B.i of the Court's Individual Practices: it is double-spaced, in 12-point Times New Roman type, with one-inch margins on all sides, and includes a table of contents and table of authorities.

2. By Order dated August 4, 2026 (*Risch* ECF No. 66), the Court granted Plaintiffs leave to file a consolidated opposition brief of no more than 40 pages. The memorandum is 40 pages, exclusive of the caption, tables, signature block, and this certificate, and therefore complies with that Order.

3. The memorandum contains 12,731 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate, as computed by Microsoft Word. Although that count exceeds the default 8,750-word limit of Local Civil Rule 7.1(c), the brief is filed pursuant to, and within the 40-page limit authorized by, the Court's August 4, 2026 Order (*Risch* ECF No. 66).

Dated: August 12, 2026

By: */s/ Matthew Novian*
Matthew Novian (pro hac vice admitted)
Lauren Woodland (pro hac vice admitted)

Cody Fisher (pro hac vice forthcoming)
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, CA 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222
matthew@novianlaw.com
laurenw@novianlaw.com
fisher@novianlaw.com

*Attorneys for Plaintiffs Adam Risch and Yonatan Gliksman*